# ECCLESTON BARNETT

*vs.*

# MARTHA PHELPS BARNETT.

*Divorce—Abandonment—Evidence of Adultery—Alimony— Custody of Child.*

Though adultery is a crime, yet when advanced as a ground for divorce, it need not be proved beyond a reasonable doubt, it being sufficient that it be proved by a clear preponderance of the evidence.                                                p. 189

Where adultery is charged, even in a civil case, the evidence adduced to support it should be examined and weighed with the most scrupulous care and, to establish such a charge, the evidence should be clear, satisfactory, and convincing.          p. 189

While it is not necessary to prove a charge of 'adultery by direct testimony, and it is sufficient that it be shown by circumstances which warrant a reasonable and prudent man in drawing an inference of guilt therefrom, it is necessary, in order to sustain the charge, that the circumstances from which that inference is to be drawn be themselves proved by clear, credible, and convincing evidence.                                      p. 189

In a divorce proceeding, a finding of adultery should be made only where the court is thoroughly satisfied of the charge by clear and convincing evidence, and such finding is not sustained where the evidence is improbable and contradictory.        p. 190

Where it appeared that, for a period of over five years, one lived apart from his wife, maintained no home for her, had no marital relations with her, and manifested an intention not to live with her again, and it also appeared that the continued separation was at his instance, that she was willing to resume their marital relations and so informed him, and that he finally failed to contribute to her support, *held* that a finding of desertion and abandonment was justified.                          p. 190

That the wife's leaving the husband's house was voluntary is immaterial, on an issue as to his abandonment of her, if she was willing to return to him whenever he provided a place to which she could come, but he refused to resume their marital relations or to provide a home for her, and finally refused to contribute to her support.                    p. 191

On a charge of adultery, in a suit by a husband for divorce, the testimony of the wife and of the alleged paramour, in denial of the charge, though that of interested parties, has a certain probative value, the extent of which depends upon the other facts and circumstances of the case, and if the evidence is otherwise doubtful, their testimony is decisive.                    p. 196

That a witness has, prior to giving his testimony, made statements inconsistent therewith, while not destroying the value of such testimony, tends to impeach it, and is to be considered in determining its credibility.                    p. 199

A charge of adultery against a wife, based on one alleged occurrence only, *held* not to be supported by the evidence in the husband's behalf, this consisting merely of the testimony of two domestic servants, who had kept silence as to the matter for about seven years, and until the wife was about to sue for a divorce, whose testimony was in itself doubtful and suspicious, and one of whom had, before the trial, denied any knowledge of the matter, it appearing that the wife bore an excellent reputation, and there being no evidence of familiarities between the wife and her alleged paramour previous to the alleged act of adultery, and both the latter denying the charge.    pp. 193-202

It appearing that the husband had an annual income of about twelve thousand dollars, from a trust fund, of which he was required to pay three thousand dollars *per annum* to a former wife, divorced from him, and that the wife's resources were limited, *held* that the action of the lower court, when granting the wife a divorce on the ground of abandonment, in allowing her an annual sum of twenty-four hundred dollars as permanent alimony, and one thousand dollars *per annum* for the support and education of their son, was not so unreasonable as to be disturbed.                    pp. 187, 203

On granting a wife a divorce on the ground of abandonment, *held* that it was proper to award to her the custody of a son, nine years old, with a right on the husband's part to see the son at reasonable times.        pp. 187, 203

*Decided November 21st, 1923.*

Appeal from the Circuit Court of Baltimore City (DUFFY, J.).

Bill by Martha Phelps Barnett against Eccleston Barnett for a divorce *a mensa et thoro* on the ground of desertion. From a decree granting the prayers of the original bill, and dismissing a cross-bill filed by defendant, asking a divorce on the ground of adultery, he appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Wilton Snowden, Jr.,* and *Elmer J. Cook,* for the appellant.

*Isaac Lobe Straus* and *William Pinkney Whyte, Jr.,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married on March 16th, 1912, at the home of Mrs. Barnett in the St. Paul Apartments, in Baltimore, and lived together as husband and wife until June 6th, 1917, when they separated. After the separation Mr. Barnett, the appellant, contributed regularly to the support of his wife and their infant child until January, 1922, when the payments to her ceased, and on April 28th, 1922, she filed the bill of complaint in this case, in which she charged that the appellant had deserted and abandoned her

and that he refused to contribute to her support, and in which she prayed that she be divorced *a mensa et thoro* from him, and that he be required to pay permanent alimony for the support of herself and their infant son, and that she be awarded the custody of the child. The defendant in his answer denied the allegations of abandonment and desertion, and later filed a cross-bill in which he charged that the defendant, Martha Phelps Barnett, had been guilty of adultery with a certain Geoffrey C. Maxwell, and in which he prayed that he might be divorced absolutely from her and that the custody of their child might be awarded to him. She denied in her answer the charges of adultery, and testimony in connection with the issues thus tendered was taken in open court, and at its conclusion and after the case had been argued by counsel the court passed the following decree:

"This cause having come on for hearing, and the testimony of the witnesses of the respective parties having been heard in open court, the proceedings having been read, and the arguments of the solicitors for the several parties having been duly considered, it is this 15th day of January, in the year nineteen hundred and twenty-three, by the Circuit Court of Baltimore City adjudged, ordered and decreed that the plaintiff, Martha Phelps Barnett, be and she is hereby divorced *a mensa et thoro* from the defendant, Eccleston Barnett; that the said Martha Phelps Barnett be and she is hereby granted and awarded the care, custody and guardianship of the infant son of the parties, Charles Phelps Barnett, with the right, however, to the said Eccleston Barnett to visit and see their said son at reasonable times.

"And it is further adjudged, ordered and decreed that said Eccleston Barnett shall pay to said Martha Phelps Barnett the sum of twenty-four hundred dollars ($2,400.00) per annum as permanent alimony, in monthly instalments of two hundred dollars ($200.00) each, accounting from the 15th day of January, nine-

teen hundred and twenty-three; and the said Eccleston Barnett shall also pay to said Martha Phelps Barnett the further and additional sum of one thousand dollars ($1,000.00) per annum for the support, maintenance and education of their said infant son, Charles Phelps Barnett, in monthly instalments of eighty-three dollars and thirty-three cents ($83.33) each, accounting from the 15th day of January, nineteen hundred and twenty-three, and to continue until the further order of this court.

"And it is further adjudged, ordered and decreed that the said Eccleston Barnett shall pay to Isaac Lobe Straus and William Pinkney Whyte, Jr., solicitors for Martha Phelps Barnett, the sum of one thousand dollars ($1,000.00) as counsel fee, five hundred dollars ($500.00) of which is to be paid on or before January 20, 1923, and the remaining five hundred dollars ($500.00) of which is to be paid on or before March 20, 1923.

"And it is further adjudged, ordered and decreed that The Safe Deposit and Trust Company of Baltimore City, the trustee of the estate and property of the said Eccleston Barnett, be and it is hereby ordered and required to pay each and all of the above sums, in the manner hereinabove provided for with respect to each of them, to the said Martha Phelps Barnett and to her said solicitors, out of the income and funds accruing to the said Eccleston Barnett from his said estate and property in the hands of said trustee; and the clerk of this court is hereby directed to transmit forthwith a certified copy of this decree to said trustee.

"And it is further adjudged, ordered and decreed that the cross-bill filed by the said Eccleston Barnett against the said Martha Phelps Barnett be and the same is hereby dismissed.

"And it is further adjudged, ordered and decreed that the said Eccleston Barnett pay all costs of these proceedings."

From that decree the present appeal was taken.

The substantial and controlling question in the case is whether the appellant sustained the charge of adultery made in his cross-bill, for neither at the oral or written argument was it seriously contended that the evidence did not sufficiently show that he had abandoned and deserted his wife and that when the original bill was filed he was contributing nothing to her support.

Before referring in detail to the testimony concerning that question, we will state the general principles by which we should in our opinion be guided in measuring and weighing the evidence produced in support of a charge of adultery in such cases as this.

While adultery is a crime under the laws of this State, yet when it is advanced as a ground for divorce it is not treated as a criminal charge and need not in such a proceeding as this be proved beyond a reasonable doubt, it is sufficient if it be proved by a clear preponderance of the evidence. 19 *C. J.* 132. Nor is it necessary that the probative value of the evidence required to justify a finding of adultery should equal that which is required to convict a defendant charged with crime. *Ibid.,* 137. But while that is true, nevertheless the charge is of so grave a character, its consequences to the person against whom it is made so permanent and destructive, and the stain upon the character of one convicted of it so indelible, as to impose upon the court trying the issue, where adultery is charged even in a civil case, the duty of examining and weighing with the most scrupulous care the evidence adduced to support it and, to establish such a charge, the evidence should be clear, satisfactory and convincing. And while it is not necessary to prove it by direct testimony, for it is sufficient if it be shown by circumstances sufficient to warrant a reasonable and prudent man in drawing an inference of guilt therefrom, it is necessary, in order to sustain such a charge, that the circumstances from which that inference is to be drawn must themselves be proven by clear, credible and convincing evidence.

It has been said: "A finding of adultery should be made
only where the court is thoroughly satisfied of the truth of
the charge by clear and convincing evidence, and such finding
is not sustained where the evidence is improbable and con-
tradictory." *Steele* v. *Steele,* 170 N. Y. S. 457. And while
it may not be necessary to adopt in its entirety that expres-
sion of the law, it is nevertheless consistent with our view of
the quantity and quality of proof needed to sustain a charge
of adultery in a divorce proceeding. *Pattison* v. *Pattison,*
132 Md. 362; *Kremelberg* v. *Kremelberg,* 52 Md. 553;
*Thiess* v. *Thiess,* 124 Md. 292; *Carter* v. *Carter,* 139 Md.
265.

We will now return to the facts of the case and the evi-
dence relating to them. It is unnecessary to refer at any
length to the evidence in connection with the appellee's charge
that the appellant abandoned and deserted her, and that at
the time the bill was filed he was contributing nothing to
her support. The circumstances under which the parties
separated are not clearly shown, nor is there anything in the
record which points with certainty to any reason for the
separation, but it is clear that, after June 6th, 1917, the
appellant lived apart from his wife; that he maintained no
home for her; and, according to his own testimony, that
after that time he had no further marital relations with her,
and that thereafter he by his conduct manifested an intention
not to live with her again; and it is also sufficiently shown
that the continued separation was at his will and instance,
and that she was willing at any time to resume their relations
as husband and wife and so informed him, and it also appears
that he finally refused to contribute anything to her support.
Under such circumstances in our opinion the learned and
careful judge who tried this case below was fully justified in
finding that the appellant had deserted and abandoned the
appellee. *Heinmuller* v. *Heinmuller,* 133 Md. 491; *Gill* v.
*Gill,* 93 Md. 652; *Muller* v. *Muller,* 125 Md. 72. For while
the evidence shows that the appellee in fact left the appel-

lant's home, it does not show that when she did so she intended to separate finally from him, but it does appear that, after she left, he by his own actions made the separation permanent, because he leased the only home they then had to his sister, and provided no other home to which his wife could go. She alleges that he forced her to leave their home, while he says she left voluntarily, but whether she left voluntarily or involuntarily is not material, because it is clear from the evidence that after she left she was willing at any time to return to him whenever he provided a place to which she could come, but that he refused to resume their former relations or to provide a home for her and finally refused to contribute anything to her support. We will therefore revert to the main question presented by the appeal, which is whether the evidence offered by the plaintiff is sufficient to sustain the charge of adultery made in his cross-bill. That charge stands or falls upon the credibility of the testimony of two colored servants given about seven years after the occurrence of the event to which they testified.

Before referring more particularly to that evidence, we will give a brief account of the persons concerned in the supposed adultery. Mrs. Barnett is the daughter of a widely known and very highly respected author and jurist, who was for many years a resident of Baltimore City. She appears from her testimony, and that of her witnesses, to be a woman of intelligence, education and refinement, a devoted mother, and up to the time of certain occurrences to which we will presently refer, an affectionate wife. Eccleston Barnett, her husband, at the time of her marriage, was a man of leisure with no fixed or permanent occupation, and who lived upon an income of between eleven and twelve thousand dollars a year, which he received from a trust estate and from which he was obliged to pay three thousand dollars a year as alimony to a former wife from whom he had been divorced. He lived a somewhat aimless life and spent his time mainly at his home and at his club, and at his club, in the fall of

1914, he became acquainted with one Geoffrey C. Maxwell, a salesman. The acquaintance between him and Maxwell soon ripened into intimacy, and they became inseparable. He took Maxwell to his home so frequently indeed that he became in Barnett's language "one of the family." While Barnett usually brought him to his home, occasionally Maxwell came without him. On the occasions of his visits to the Barnett home the relations between him and Mrs. Barnett were friendly, but aside from the single occurrence to which we will later refer, there is nothing whatever in the record to indicate that she regarded him or treated him as anything more than a friend of her husband, or that there was any suggestion of impropriety in her conduct towards him. In the spring of 1916, however, Barnett became suspicious that Maxwell's frequent visits to his home were due more to his sentiments towards Mrs. Barnett than to any friendship which he entertained for her husband, and he, Barnett, told his wife that she "was seeing too much of" Maxwell, but there is not a single incident referred to in the testimony which indicates that Mrs. Barnett by her conduct induced Maxwell to visit the home, but on the other hand the testimony is clear that it was Barnett who first brought him there, and who continued, even after he had complained to his wife that she was seeing too much of him, to bring him to his home. When he made that complaint to Mrs. Barnett, it does not appear that she expressed any desire to see Maxwell again, nor does it appear that she ever did see him again except when he was brought to her home by her husband or came as his guest, except on one occasion when she met him casually for a few minutes on a street in Baltimore. Barnett in December, 1917, enlisted in the United States Army, and in the following April was sent overseas. He was severely wounded in action and confined to a hospital for about eight months. The demobilization of the American armies following the close of the war appears to have taken place shortly after his discharge from the hospital, and he was then finally discharged from the army.

At the time the alleged adultery is said to have occurred, Mr. and Mrs. Barnett were living in a "flat" in an apartment house at 803 Hamilton Terrace in Baltimore. The "flat" or apartment contained five rooms and a bath. The bath room was at one end of the apartment, next to it was the bed room occupied by Mr. and Mrs. Barnett, and next to that, and separated from it by a folding door, was another bed room which two colored servants occupied. Then came in order the sitting room, the dining room and the kitchen. The folding door between the servants' bed room and the bed room used by Mr. and Mrs. Barnett did not fit very well and was never locked, and in consequence the slightest sound made in one of these rooms would be audible in the other.

One of the servants who occupied the servants' bed room was Laura Johnson, a colored woman, one of the two witnesses adduced to prove the charge of adultery. After having tried two years at teaching school in Anne Arundel County, she had gone to work for Mr. and Mrs. Barnett in 1913, and remained with them until the spring of 1916, and she was with them at their apartment on Hamilton Terrace when the supposed adultery is said to have occurred. She testified that on one occasion, about the middle of January, 1916, Maxwell had supper with Mrs. Barnett in the Barnett apartment, while Mr. Barnett was absent in New York, and that after supper Maxwell and Mrs. Barnett left the apartment at about 7 o'clock. That some time after they had gone, the witness and another servant, Bertha Thomas, who had put Mrs. Barnett's little boy, then a child two or three years old, to bed, themselves went to bed in the servants' room. That later that night they were aroused by the return of Mrs. Barnett and Maxwell, and Sarah Thomas, one of the women, got up and let them in the apartment, and then returned to her bed. When asked whether on that occasion Barnett was out of the city she said. "Yes, sir, I think I remember one time Mr. Barnett said he was going to New York or some place," and later she testified, "When he left, the day he

left did any one come to the house, after he had gone that same day? No one I do not think—I don't know if it was any one. I am sure Mr. Maxwell came. Q. When was that? A. He was to supper I think * * * that was in January * * * I guess it was, as far as I can remember about the middle of January, somewhere along there."

She said that she did not herself see the people who came into the apartment but that she heard voices which she identified as the voices of Maxwell and Mrs. Barnett. That after Bertha Thomas had returned to the room which she and the witness occupied she heard voices in Mrs. Barnett's bed room which she recognized as the voices of Maxwell and Mrs. Barnett. The witness, when asked to describe what she had heard on that occasion in that room, said, "Well, I heard the talking and the whispering in the room, and then I heard the bed making a lot of noise * * *. And I heard a lot of noise and the noise kept up, and the noise of the bed kept up. I heard whistling in there and it just annoyed me, and I got up to raise the window and let them know some one was awake in the next room and put the window down again and the noise stopped." She further testified that early the following morning, apparently before it was quite light, she heard some one leave the apartment and that she and Bertha Thomas went to the window and she saw some one, whom she "taken" to be Mr. Maxwell, leave the house and get in an automobile. On her cross-examination the witness said that she lived at Waterbury, near the country place on the Severn where Barnett had formerly lived and which he had leased to his sister, and that she had told Barnett of what she had seen when he came to her home in May, 1922, to find out what she knew about it. She also admitted that, after his visit, Mrs. Barnett saw her and asked her, whether she had "ever seen her do anything wrong with Mr. Maxwell," and that she had told her that she never had, and that she told her that "to stop the argument, I told her I did not know anything about it." The witness was examined at some length concerning her

employment and actions since 1916, apparently for the pur-
pose of testing her memory. She had, at the time she testi-
fied, been married about three years, but she was unable to
remember clearly the year of her marriage. She had worked,
she said, for two families at Roland Park after she left the
Barnetts in 1916, but she could only remember the name of
one of her employers. She was employed for a time by Mrs.
Freeman, Mr. Barnett's sister, and only recalled that fact
when it was suggested by a question.

Bertha Thomas, the other colored woman was, at the time
the supposed adultery is said to have occurred, employed as
a nurse at the Barnett home. Her testimony is cumulative
and corroborates that of Laura Johnson, and need not be re-
ferred to in detail, except as to certain parts of it which
illustrate an unusual identity of memory and expression in
the testimony of the two witnesses. She was asked: "Do
you remember any time while you lived at Hamilton Terrace,
that Mr. Barnett went away for any length of time? A. Yes,
sir; he said once he was going to New York on business * * *
he was out of the house * * * about two or three days * * *
That was somewhere in January * * * I guess it must have
been about the middle, I guess, yes, middle of January."

The testimony of these two witnesses to the single incident,
which they say occurred on the night in question when Mr.
Barnett was away, is all the testimony in the case which in
any way tends to support the charge of adultery. If their
testimony can be believed, it is manifestly sufficient to prove
that charge, and the case finally turns upon its credibility.
It is not corroborated by any fact or circumstance proved by
any other witness in the case, and it must therefore be meas-
ured by its own intrinsic probability. Except for what they
said, the character of Mrs. Barnett for probity and chastity
is unimpeached, since there is nothing else to show that she
at any time by her conduct indicated that she had any undue
affection for Maxwell, or that she was ever upon intimate
terms with him, or that she treated him with any more con-

sideration than courtesy would naturally require her to show to her husband's guest.

There are circumstances connected with the testimony of these two women which in our opinion makes it exceedingly unsafe to accept it as conclusive. First, it is contradicted directly and unequivocally by both Maxwell and Mrs. Barnett, and while they are interested in disproving the charge, and the value of their testimony is to that extent lessened, their testimony has a certain probative value, the extent of which depends upon the other facts and circumstances of the case. In speaking of the weight to be given such testimony it is said in *Nelson, Divorce and Separation,* par. 193: "Both accused and the *particeps criminis* are interested witnesses. Not only the result of the suit and their reputation are at stake, but there is also danger of indictment for the offense. While their testimony is admissible and entitled to some consideration yet it is most difficult to determine its correct weight. It is clear that where the case rests upon the uncorroborated testimony of one witness and he is not clear as to the identity of the accused, or the details of his testimony are improbable, or evidently false in some particulars, the evidence is not sufficient to establish a charge of adultery against the full and explicit denials of the defendant and the paramour," and in paragraph 194, *Ibid.,* it is said: "But where the evidence is otherwise doubtful, such testimony although not untainted is decisive."

Second, the life and conduct of the defendant, up to the commission of the alleged adultery, is utterly inconsistent with the story told by the two women, for it is certainly unlikely that a virtuous wife, who had always led an exemplary and respectable life, would commit an act of adultery under circumstances which, as stated in this testimony, must have shocked the sensibility and conscience of the most abandoned woman. For, as said in *Bishop, Marriage, Divorce and Separation,* par. 1368, "proximate familiarities while alone amounting to nothing, are almost, yet not absolutely, indis-

pensable in connection with more direct proofs. For the lack of which evidence, in a case before the full English Divorce Court, the learned judges refused the decree prayed against a wife who for twenty years had been exemplary in her married life, where adultery was testified to by those who professed to be eye-witnesses." Said CRESWELL, J.: "There is not a tittle of evidence to show that, during the whole period of their cohabitation, she had done anything to raise the slightest suspicion of her infidelity in the mind of her husband, or that up to the time of the alleged adultery she had in any way misconducted herself. The court is now called upon to believe that Mrs. Alexander at once, without any preparation, condescended to disgrace herself with a groom who had been about two months in her husband's service, with so little regard for delicacy, with so little regard as to whether she was discovered or not, that she was guilty of acts of adultery with him in the face of day, without taking the precaution of pulling down a window blind or closing a wash house door." *Alexander* v. *Alexander,* 2 Swab. & T. 95, 101, 102.

Third, the long unbroken silence of these two women is in itself a suspicious and significant circumstance. They knew that Mr. and Mrs. Barnett had separated and after the separation one of them, Laura Johnson, continued to work for Mrs. Freeman, Mr. Barnett's sister, who, Mrs. Barnett testified, was responsible in some degree for the separation between her and her husband, and who was on bad terms with Mrs. Barnett. During that entire period they knew or could have learned where Mr. Barnett was to be found, but according to their testimony, they said nothing to him, nor to any one else about what they had witnessed. That their silence was not due to any desire to shield Mrs. Barnett appears from the ease with which Barnett finally obtained the story from them, and the Johnson woman at least had no scruples about telling a falsehood, when it was more convenient than the truth, since she herself testified that al-

though she did know of the adultery nevertheless she had told Mrs. Barnett that she knew nothing about any such occurrence, "to stop the argument." The suspicion attaching to their story is increased by the unusual and singular explanation given by Barnett of his action in going to them when he did, to inquire what they knew of his wife's conduct. He had, he said, never charged his wife with adultery until these women told him their story, and neither of them told him the story until just before his wife sued him for a divorce. During the entire period of six years it never occurred to him to question the two servants who were constantly in the house during the time of Maxwell's intimacy there, and he would never have thought of it at all, he says, had not a friend in New York suggested to him that he question them about his wife's conduct. It is as odd, on the face of it, that his intimate friend whom he had seen a number of times after the separation, refrained from making that suggestion for six years, as that he himself never thought of so obvious a course, until the possibility that he might have to defend an action for divorce became imminent.

Fourth, the testimony of one of these witnesses is impeached by the fact that, prior to testifying in this case, she made statements unsworn, contradicting her testimony. Laura Johnson testified that Mr. Barnett asked her if she had known of any improper conduct on the part of his wife, and that she had given him the facts from which the appellant inferred his wife had been guilty of adultery. She further testified that, after that, Mrs. Barnett visited her, and asked her if she had ever seen her do anything wrong with Mr. Maxwell, and that she had told her that she had not, and that she told her that to stop "the argument." This witness at first said that Mrs. Barnett asked her if the witness had ever seen her "undressed with Mr. Maxwell" but she later admitted that what she had been asked was "whether she had ever seen Mrs. Barnett "do anything wrong" with Maxwell, as will appear from this excerpt from her testi-

mony: "Didn't you tell her that you had not seen her do
anything wrong with Mr. Maxwell? * * * Yes, sir * * *.
That is clear, isn't it, there is no doubt about that? You told
her that? * * * I told her that to stop the argument. I told
her I did not know anything about it." And in this at least
she is corroborated by the testimony of Miss Grace L.
Maloney, a notary public, and Jacob Thomas, a colored
porter, both of whom said that the witness had said in their
presence that she did not know anything of the facts to
which she later testified. The fact that a witness has, prior
to giving his testimony, made statements inconsistent there-
with, while not destroying the value of such testimony, does
tend to impeach it, and that such a fact is material in deter-
mining the credibility of such testimony is generally recog-
nized. *Jones, Evidence,* par. 845. It is self evident that a
witness who deliberately, for purposes of convenience, makes
statements, even though unsworn, which his sworn testimony
contradicts, is entitled to less credence than one who is not
so impeached. And when this witness admitted that she told
Mrs. Barnett that she had not seen her do anything wrong
with Mr. Maxwell, her sworn statement later, that she knew
Mrs. Barnett and Maxwell were together in the same bed
room, is entitled to less weight than it would have been had
she told Mrs. Barnett of what she had seen or heard, for if
one deliberately disregards the truth when not under oath,
it is not altogether certain that he will have any higher re-
gard for the truth when he is sworn to tell it.

Fifth, the story told by these women is inherently im-
probable. As we have stated, there is nothing in the record
which even tends to show any of those "proximate familiar-
ities" which so often in cases of this character illuminate
obscure and doubtful facts and aid the courts dealing with
them to give them their proper weight and significance. And
in dealing with the evidence relating to such a charge the
facts relied upon to support it cannot be considered separately
but should be taken together, since a fact which considered

alone may appear innocent or incriminating, as the case may be, may have an entirely different significance when considered in connection with the other facts in the case. And an act which standing alone might be consistent with innocence, might have an entirely different aspect when viewed in the light of the known and established relations between the parties to it. As for instance where the conduct of the parties showing a disposition to commit the act of adultery concurs with an opportunity for its commission, the court will infer that it has been committed. 19 *C. J.* 139; *Fassett* v. *Fassett,* 143 Md. 35.

Because the meaning and significance of the facts from which the act of adultery may be inferred are so much affected by their relation to other facts and to the persons to whose conduct they relate, it is impossible to formulate a general rule as to what circumstances will or will not constitute proof of adultery. "The reason why it is impossible fully to indicate the circumstances which will lead to such a conclusion is 'because they may be infinitely diversified by the situation and character of the parties * * * and by many other incidental circumstances apparently slight and delicate in themselves, but which may have most important bearings in the particular case.' *Loveden* v. *Loveden,* 2 Hagg. Const. 1, 3, 4 Eng. Eccl. 461." 19 *C. J.* 138, n. 88 (a).

The distinction between this case and such cases as *Dicus* v. *Dicus,* 131 Md. 87; *Fassett* v. *Fassett,* 143 Md. 35, and *Shufeldt* v. *Shufeldt,* 86 Md. 519, is that here the inquiry is as to the sufficiency of the testimony to establish a single fact, which, if established, is conclusive of the matter in issue, while in those cases the inquiry was whether certain facts, which the court treated as established, were sufficient to warrant an inference of guilt, or in other words, the issue here is the existence *vel non* of controverted facts, while there the the issue was the construction and interpretation of facts which were either conceded or established.

In weighing the testimony of these two women, therefore, the question before us is not what their testimony means if true, for as to that there could be little doubt, but whether it is in fact true.

The story told by them is in our opinion improbable for these reasons. It is possible, although unlikely, that a refined and intelligent woman of good reputation would suddenly, without any previous evidence of immoral or improper conduct, commit an act of adultery with a man for whom she had never shown any affection; that she would commit such an act in the very room in which her infant child lay sleeping is improbable; that she would do so not only practically in the presence of two servants, but with so little regard for that fact that she and her paramour advertised their presence in her bedroom by "whistling" and making noises of such a character that the servants in the adjoining room felt compelled to remind them of their presence, is, in the absence of the most convincing evidence, incredible. That Mrs. Barnett knew of the servants' presence in the apartment is undisputed, for the servants say that they admitted her. That she knew they could hear everything that occurred in her bed room is equally clear, because all the witnesses who described the apartment testified to that fact. And that she did value her reputation, and that she did have a mother's affection for her child, is abundantly shown by the evidence in the case. That, under such conditions she should not only commit the offense with which she is charged, but that she should do so in such a manner and under such circumstances as to make it certain that the fact that what she had done would be known to the two colored servants, is contrary to common experience and the knowledge which men have of the motives that rule human conduct, and to convict her of conduct so wanton and irrational the evidence should be clear and untainted.

Sixth, there is another circumstance which reflects upor this testimony, and the character of the witnesses who gave

it, which is not without significance. That is the fact that, although one of the witnesses, Laura Johnson, had so poor a memory that she could not recollect the year of her marriage, which had occurred only a few years before, and could not recall the name of one of the only two employers for whom she had worked at Roland Park, she was yet able to remember the precise time when Barnett was absent from his home, about seven years before, where he went, what she heard him say as to where he was going, and how long he stayed, and the further fact that her recollection coincided so exactly with that of Bertha Thomas, who recollected the same facts, and stated them in the same order and in substantially the same language. Such a striking identity of memory and expression in the testimony of two witnesses (one of whom at least had a poor memory) as to matters transpiring seven years before they gave their testimony and when neither of them, after the morning following the supposed occurrence, ever spoke of it either to each other or to anyone else until they were approached by Barnett in 1922, is in itself a suspicious circumstance. That they should have remembered the event if it occurred is natural, but that their recollections of more or less collateral facts in such detail should after so long a time have corresponded so exactly is highly improbable.

For these reasons, considering it in the light of, and in connection with, all the other facts and circumstances of the case, we cannot accept the testimony of these witnesses as sufficient to sustain the charge of adultery made against the appellee. And in reaching that conclusion we are not influenced by the consideration that the two witnesses were domestic servants, nor by the fact that the learned judge who decided this case below had the advantage of seeing and hearing the witnesses testify, but rest it upon the reasons we have stated. For if a woman who had lived a decent, decorous and upright life, and who enjoys the respect and esteem of those who know her, can upon such testimony as that offered

in this case be convicted of adultery, then the reputation of no woman could be considered safe.

It follows from what we have said that we find no error in the action of the lower court in dismissing the appellant's cross-bill, nor, after a very careful consideration of the record and the very earnest and thorough argument of counsel, have we been able to discover any error in its action in dealing with the custody of the child, the question of alimony, or in granting to the appellee a divorce *a mensa et thoro.* As stated above, the evidence is sufficient to show that the appellant without just cause abandoned and deserted his wife, and that he refused to contribute to her support, and, that being true, she is as of course entitled to be divorced *a mensa et thoro* from him. Nor, considering the station in life of the parties to the cause, and the wealth of the appellant and the resources of the appellee, do we consider the allowance made for her support and that of her child so unreasonable as to warrant us in disturbing it, and in view of his age the action of the lower court in awarding the custody of the child to Mrs. Barnett was unquestionably proper. The decree appealed from must therefore be affirmed.

*Decree affirmed, with costs.*