## A. EVELYN LYNCH *v.* J. EDWIN LYNCH.
[No. 119, October Term, 1933.]

*Decided January 31st, 1934.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Richard H. Stevenson,* for the appellant.

*John Grason Turnbull,* with whom was *H. Courtenay Jenifer* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

From a decree dismissing the suit of a wife for separate maintenance by her husband, the plaintiff has appealed.

The parties were married in 1916. They have lived apart since 1925. In that year the plaintiff went to the home of her father to care for him in his last illness, which continued for a period of eight weeks. During part of that period her husband would take her each morning in his automobile to her father's house, which was four or five miles distant from their own home, and would return for her at night. Because of the inconvenience of this plan, he suggested that she spend all of her time at her father's during the further course of his illness. After the death of her father, the defendant did not take his wife back to their home, but left her at the father's late dwelling immediately upon returning there from the funeral.

The day after her father's death the plaintiff had gone to the home of herself and husband, and, as she testified: "He told me he hated me and never wanted to live with me again, and he cursed me and cursed my whole family." A few days after her father's funeral, she visited her husband with his brother, who asked the defendant what he intended doing, to which question he replied: "I am done, I would rather die than live with her again." Shortly afterward, from her mother's home, the plaintiff wrote a letter to her husband, who then called to see her there and proposed a divorce. The interview is thus described in her testimony. "That was his one topic of conversation, 'divorce', that he thought it was the best thing, he knew others had gotten them and were perfectly happy and didn't see why he should not, and I said: 'Ed, if that is the way you feel about it and the decision you have come to, it is up to you.' Q. Did you want

a divorce? A. No, sir; I had not applied for one or ever thought of such a thing."

In 1928 the plaintiff sued her husband for alimony. At the hearing of that case, the court suggested that an effort be made for a reunion. In pursuance of that suggestion they had a private interview, to which the plaintiff's testimony thus refers: "Q. Tell what your husband said when you asked him about going back to live with you? A. He told me he would rather die in jail than ever live with me again." She reported that statement to her own and her husband's counsel. Her testimony then proceeded, in part, as follows:

"Q. Now after that, after your husband said he would rather die in jail than live with you, did you make any effort to talk to him about reconciliation? A. Yes. Q. Tell his honor about that? A. He went to a cousin of mine and asked her to call me and tell me he would like to have a talk with me, and I walked across to his home to see him and met him outside, and he asked me for his mother's sake not to put him in jail. In the meantime Judge Grason told him if he failed to come up with his payment he would put him in jail, and he asked me for his mother's sake not to put him in jail, and I said, what do you think you are doing to my mother, and I told him I would wait until later and in the meantime he promised he would do what was right and provide a home for us as soon as he could, and I let him off two or three more years. Q. Tell his honor whether you accepted that offer? A. Yes, I accepted, I always accepted. Q. Did he provide a home for you? A. No, he did not. Q. Can you specify the time when that was, you said he made it, what year, how many years ago? A. It must have been at least four years ago, at the time this trial came up here, right after that. Q. Did you see your husband after that and talk to him about a reconciliation? A. Yes, I saw him repeatedly for a year. Q. Where? A. He came to see me frequently. He didn't have a car of his own, he borrowed a car when he did come to see me. Q. Where did he come to see you? A. At my mother's. He didn't come in the house,

but he phoned me beforehand and I knew what time he would get there, and I went out and got in the car and went with him and for at least a year before he finally stopped coming altogether. He came to me, I don't think, to be exact, six times, he came to see me six times after he was employed in the fire department. Q. What would you talk about? A. Very often about that, and he promised me faithfully on three different occasions to provide a home, and I asked him how soon that would be, and he said about a year. Q. Did he ever offer to provide you a home at the time of the conversation, did he say he had a home, come and go to it. A. No, he did not. Q. It was always in the future? A. Always in the future. Q. What did you do about these offers, did you accept them or reject them? A. Yes, I have always let him understand I was perfectly willing to go back and forgive everything, and try it over and go back again. Q. You told him that? A. Yes. * * * Q. When did Mr. Lynch stop coming to see you, stop talking about reconciliation? A. This last spring, a year ago."

After an extended cross-examination of the plaintiff, which did not materially affect her testimony, the court made inquiries and elicited answers as follows: "Q. I want to ask you a very plain question, I think it has some materiality. When did your marital relations cease? A. I don't know just what you mean. You mean at the time of the separation? Q. No; I mean the last time you and your husband had marital relations? A. In the year of 1930, after his promises, after three or four promises to establish a home for us."

There was corroboration of the plaintiff's testimony as to some of its details, including the reference to her husband's refusal of a reconciliation at the time when the former suit was about to be tried. No evidence whatever was offered in the present case by the defendant, and he submitted it for decision upon the testimony which the plaintiff had produced.

In our opinion, the plaintiff is entitled, upon the evidence in the record, to a decree requiring her husband to contribute to her support. It was his fault, according to the proof, that their separation began and has continued. No effort was

made by him to sustain the allegation in his answer to the suit that he had been deserted by his wife, and he asked at the hearing for the dismissal of his cross-bill, which also contained that charge. The attitude of his wife during the prolonged period of the separation is proved without contradiction to have been consistently favorable to a reunion. Repeated overtures were made by her to that end. It was because of her husband's opposition that such a result was not accomplished. While still living apart, they resumed marital associations during a time when he was promising to provide a home for themselves and their two young daughters, who had been allowed to remain without question in their mother's custody. But that relationship between the husband and wife was ended by the abrupt cessation of his visits "without a word of warning," as she testified. This occurred in the spring of 1931, and the separation has since been complete.

For several years after the original separation, the defendant retained the home which he and the plaintiff had previously occupied, and the fact that she did not return to it is the basis of a contention that she was responsible for a continuance of the separation during that time. But this theory is refuted by the evidence as to his rejection of her overtures to return. His promises, during the partial resumption of their relations, to provide a home for them a year later, could not be regarded as a reason for placing upon her the blame for the subsequent total separation caused by his sudden and unexplained ending of those associations.

The charge of desertion of the wife by the husband is sustainable upon the evidence in this case, because it proves the unwillingness and refusal of the husband, without justification, to continue or renew their normal marital relationship. *Tarr v. Tarr,* 164 Md. 206, 164 A. 543; *Simmont v. Simmont,* 160 Md. 422, 153 A. 665; *Downs v. Downs,* 154 Md. 430, 140 A. 831; *Barnett v. Barnett,* 144 Md. 184, 125 A. 51; *Heinmuller v. Heinmuller,* 133 Md. 491, 105 A. 745; *Muller v. Muller,* 125 Md. 72, 93 A. 404; *Buckner v. Buckner,* 118 Md. 101, 84 A. 156; *Taylor v. Taylor,* 112 Md. 669, 77 A. 133.

The decree below, while dismissing the bill of complaint and the cross-bill, required the defendant to make certain payments monthly for the maintenance and support of the two minor children. To the extent of the latter provision the decree will be affirmed, but it will be reversed with respect to its dismissal of the plaintiff's bill, and the cause will be remanded for a decree providing for alimony payments by the defendant to the plaintiff in such amounts as the chancellor may determine to be just in view of their circumstances.

> *Decree affirmed in part and reversed in part, and cause remanded for a decree in conformity with the opinion of this court, the costs to be paid by the appellee.*