## JOHN GEORGE BACKUS *v.* CATHERINE A. BACKUS.

[No. 21, April Term, 1934.]

*Decided April 27th, 1934*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*J. Calvin Carney,* for the appellant.

*Stuart M. Yeatman,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married in 1929, and lived together at the home of the husband's mother in Baltimore until November, 1930, when they separated. After that he continued to live with his mother, while she found a home elsewhere.

In October, 1931, she filed a bill for a limited divorce against him in the Circuit Court of Baltimore City on the grounds of desertion and failure to contribute sufficiently to her support. The husband, John George Backus, filed an answer denying those charges, and the case came on for a hearing on the issues thus made. In the course of the hearing the chancellor suggested that the parties "go back to live together," and, following that humane and amiable suggestion, he dismissed the bill. The parties, however, continued to live apart, and on July 22nd, 1932, Catherine A. Backus, the wife, filed the bill in the present case against her husband praying a divorce *a mensa et thoro,* permanent alimony, alimony *pendente lite,* and suit money, on much the same grounds as those alleged in the first bill. In that bill, referring to her husband, she said: "That she has earnestly requested him to provide a home for her, so that they might resume their marital relations and has gone so far as to go to his residence where he is now living with his mother, and stated to him that where his home is she was going to reside. He has refused to allow her to occupy this residence, nor does he provide another residence for her. That under date of July 19th, 1932, she was ordered from the premises occupied by him." Defendant in his answer, after denying the averments of the bill as to desertion and his failure to properly support his wife, said in part:

"Your respondent, however, admits that the complainant has been to his residence, where he is now living with his mother and stated to him that where his home is she was going to reside. Your respondent admits that the complainant was not allowed to occupy said residence and he has not provided another residence for her. Your respondent also admits that the complainant was ordered from the premises occupied by your respondent, but was not ordered from the premises by him. Your respondent denies that he has deserted the said complainant and that his act is voluntary without just cause or excuse, but he admits that there is no reasonable hope or expectation of a reconciliation, as will be more fully hereinafter shown."

The case was heard upon those pleadings, and at the conclusion of the evidence the chancellor signed a decree divorcing the wife *a mensa et thoro* from the husband and awarding her five dollars a week alimony and a ten dollar counsel fee. The appeal from that decree presents as the only issue in the case the question whether the evidence establishes the wife's charge of desertion.

The evidence fails to show under what circumstances the parties first separated, but does show that after the dismissal of her first bill the appellee offered to resume cohabitation with her husband, and that he refused the offer, apparently on the ground that it was not made in good faith.

Since his marriage, Backus has lived with his mother, Mrs. Emma Backus, who conducts a delicatessen business in the Cross Street Market in Baltimore. In that home, at the time the appellee left it, there lived also Mrs. Grant, her husband's sister and her husband; and after the appelle left, Mrs. Webb, Mr. Grant's sister, moved in. The relations between the appellee and the Backus family were in no sense harmonious, and it is not open to question that the elder Mrs. Backus definitely decided that she did not want the younger Mrs. Backus in her home.

A few days after the termination of the first suit the appellee wrote her husband a letter, in which she said in part:

"You are undoubtedly aware of the fact that our case has been dismissed in the Circuit Court by Judge Stein, and I have been advised by him that it is your duty to support me. To day I received a money order of five dollars, and I want to call your attention to the fact, first you are back in your payments under court order; secondly five dollars will not support me. I am not working unable to work and it is necessary for me to feed myself, and provide a room but it is up to you to do the right thing and provide a home in which I can live with you as a married woman should. I am asking you now to provide a home for me where I can live peacefully and without arguments. If you are willing to do this, I want to hear from you at once.

"There should be no reason for me to go to Court to compel you to support me. You married me and it is your duty to provide a home for me as every married man should, and support me. You have no reason for not providing this home and I am sure that if we get away to ourselves, we can get along alright."

Receiving no reply she went to the filling station where her husband was employed and, to quote her testimony: "I waited until he got off from work and rode up to his house with him in the machine. He told me then I was not going to go in the house. I said, 'I am, if you are going there, I am going back with you,' and when I got there his mother, sister and brother-in-law were at the door. His mother told me she did not want me on the grounds, it was her house and I could not put my foot on it. I stayed there until about half past eleven that night, trying to get my husband to make up with me and come to some conclusion. He went in the chicken shed and I don't know where he disappeared from there. It started to rain and I went on home. Q. On that occasion did you have your clothes with you, A. Yes, sir."

Referring to the same occasion Backus testified:

"Q. And Mrs. Backus has testified that she came to the oil station on Pennington Avenue and asked that you take

her back, is that correct? A. No, sir. Q. Did she come to the oil station? A. Yes, sir. Q. Didn't you, as a matter of fact, get in your machine and drive your wife home? A. She would not get out. Q. What did she tell you why she would not get out? A. She wanted to go up home. * * * Q. When you got up to the house was your mother there at the house? A. Yes, sir. Q. Did your mother have any conversation with Mrs. Backus? A. No, sir. Q. Where were you, did you go directly in the house? A. No, sir. Q. Where did you go? A. Stayed outside. Q. You stayed outside where, did you sit in the car with her? A. No, sir. Q. Where did you go? A. Just stayed outside. The Court: Whereabouts outside? The Witness: I stayed out about an hour and it started to rain and I went in the shed. * * * Q. Why didn't you go in the house? A. No, sir. Q. Why didn't you go in the house? A. The door was locked. Q. The door was locked? A. Yes, sir. * * * Q. Now, Mrs. Backus wrote you that letter about going back together again? Did you answer it? A. No, sir. Q. You received a letter from me that has been read here in court. Did you answer that? A. No, sir."

Mrs. Emma Backus, speaking of the same incident, said: Didn't she, as a matter of fact, come down to the house and you told her to get off the premises? A. She came with my son and I didn't want her, no. Q. And you told her to get off the premises? A. No, I didn't say that. I let the door closed because I was afraid to open the door."

The same witness, referring to the occasion on which the appellee left her home prior to the first suit, said: "I was in the hen house one day and she started an argument but I never answered her and she says, 'Well, there is nothing too low for me to stoop and whenever I pull out I will make it hot for him'. I said, 'Is that so?' And she said, 'Yes, indeed,' and out she went. * * * Q. Because of that threat she made, you refused to let her come into the house, is that right? A. Yes, sir, she caused too much disturbance."

Backus explained his wife's visit to him at the filling station as an effort to get money. He said that when she came, she told him, "Here I am, I ain't going to go until I get money," and that he replied "I don't see why I have to give you money, you ain't got anything on me." He also testified that on that occasion she waited for six hours at the filling station before he drove her to his mother's home.

The appellee denied that she spoke of money at that time, and while it appears that Backus did contribute to her support, it also appears that his contribution was "under a court order."

Backus was not called as a witness on his own behalf, but was called by the appellee and cross-examined by his own counsel. Neither in the course of that examination, nor from any other source, was there the slightest evidence that he was willing to resume cohabitation with his wife, while she on the other hand, after having said that she preferred to live away from her husband's family, when asked by the court "Suppose his circumstances do not make it possible for him to live elsewhere and he provided a couple of rooms for you there and gave you a reasonable amount of privacy, would you live there with him?" answered, "Yes, your Honor."

Summarizing this testimony and the record admissions, it appears that Backus and his wife separated under circumstances which the court in the first case found insufficient to charge him with desertion; that following that decision, Mrs. Backus, the appellee, made repeated efforts to effect a reconciliation, but that Backus repulsed those efforts, failed to provide her with a home of any kind anywhere where she could live with him, that when she attempted to join him in his mother's home, the door, with his acquiescence, was shut in her face, and that, while he did contribute to her support, he did so under the compulsion of judicial process, that she is willing to resume cohabitation with him under any reasonable conditions, but that he is unwilling to live with her under any conditions. Under those circumstances the decree of

the chancellor that he had deserted her was not only just and sound, but inevitable.

In support of that somewhat obvious conclusion it is only necessary to cite *Kirkwood v. Kirkwood* 165 Md. 547, 170, A. 180, 182, in which Judge Parke, speaking for this court, said: "It is undoubtedly true that, if one spouse leaves the other without cause, as in the present instance, and repents and proposes to renew the cohabitation, and that other refuses, it constitutes desertion by the one refusing from the time of the refusal, provided the offer to return is made in good faith, and is free from improper qualifications and conditions, and is really intended to be carried out in accordance with the performance of the duties and obligations of the matrimonial cohabitation. *McClees v. McClees,* 162 Md. 70, 74, 75, 158 A. 349; *Simmont v. Simmont,* 160 Md. 422, 432, 153 A. 665; *Wise v. Wise,* 159 Md. 596, 598-600, 152 A. 230." And *Lynch v. Lynch,* 166 Md. 300, 170 A. 764, 765, where Judge Urner, announcing the opinion of the court, said: "The charge of desertion of the wife by the husband is sustainable upon the evidence in this case because it proves the unwillingness and refusal of the husband, without justification, to continue or renew their normal marital relationship. *Tarr v. Tarr,* 164 Md. 206, 164 A. 543; *Simmont v. Simmont,* 160 Md. 422, 153 A. 665; *Downs v. Downs,* 154 Md. 430, 140 A. 831; *Barnett v. Barnett,* 144 Md. 184, 125 A. 51; *Heinmuller v. Heinmuller,* 133 Md. 491, 105 A. 745; *Muller v. Muller,* 125 Md. 72, 93 A. 404; *Buckner v. Buckner,* 118 Md. 101, 84 A. 156; *Taylor v. Taylor,* 112 Md. 669, 77 A. 133."

The contention that the offer of the appellee to resume cohabitation was not made in good faith finds no support in the evidence, and is flatly contradicted by the established facts. Certainly there could be no better evidence, not only of her willingness to resume cohabitation but of her determination to live with her husband, than is afforded by the undisputed evidence that she waited for six hours at his place of work in order to return with him to his mother's home, where he lived, and that she

waited from shortly after six o'clock in the evening until nearly midnight, and until driven away by rain, for the door of that home to be opened. Certainly that very real and deliberate attempt to return to the home of her mother-in-law, which was also her husband's home, notwithstanding their ill will and dislike for her, furnishes striking testimony of the good faith of her offer to resume cohabitation.

At the same time the attitude of the husband towards his wife is demonstrated by his own admissions that, instead of asking that his wife be admitted to the home, he withdrew into a chicken shed to await developments, and apparently staid there until she finally left, that when she asked him for money for support, he told her that "I don't see why I have to give you money, you ain't got anything on me," and that when she had told him that where "his home was she was intended to reside," that he neither answered her letter offering to resume cohabitation, nor accepted her oral offer, that she was not allowed to occupy his mother's residence, and that he provided no other home for her.

In fact the entire evidence permits no reasonable doubt that the husband's conduct was in pursuance of a deliberate policy of getting rid of an unwelcome wife, whose demands for consideration and support had become a burden, while she, either from choice or necessity, has been and is willing to resume cohabitation even though it be in a home where she knows she will not be welcome.

It follows that there was no error in the decree from which this appeal was taken, and it will be affirmed.

*Decree affirmed, with costs.*