## LOUIS BUCKNER *vs.* BELLA BUCKNER.

*Divorce a mensa e thoro*: *desertion by wife; insufficient reasons; rudeness of step-children; counsel fees.*
*Alimony.*

A widow married a widower with grown daughters; shortly after the marriage, because of dissentions with the daughters, she left her husband and refused to return unless he should furnish her with a home apart from his daughters; the husband refused to do so, and upon her refusal to return, the husband filed a bill against her for divorce *a mensa et thoro*, on the ground of desertion. *Held that,* under the circumstances, the acts of discourtesy on the part of the children of which the wife complained, were not sufficiently serious to entitle her to demand a separation of the daughters from their father as a condition of her performing her marital obligations and that the husband was entitled to his decree pp. 111-112

The question as to whether a wife is justified by the husband's conduct in leaving him must be determned by the particular circumstances of each case. The law will not countenance the living apart of a husband and wife except for grave and weighty causes. p. 112

Desertion as a marital offense consists in the voluntary separation of one of the married parties from the other, or the refusal to renew suspended co-habitation, without justification, either in the wrongful conduct or consent of the other party. p. 113

Alimony cannot be required in favor of a wife who lives apart from her husband against his objection and without sufficient cause. p. 113

The allowance of counsel fees to the defendant's solicitor in certain divorce proceedings, *held* to be proper and adequate under all the circumstances of the case.    p. 113

*Decided March 27th, 1912.*

Cross appeals in one record from Circuit Court No. 2 of Baltimore City (STUMP, J.). The facts are stated in the Opinion of the Court.

The appeals were argued together before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Louis Hollander* (with whom was *David Ash* on the brief), for Louis Buckner.

*E. Allan Sauerwein, Clifton S. Brown* and *Victor I. Cook* filed a brief for Bella Folk Buckner.

URNER, J., delivered the opinion of the Court.

The appellant and appellee were married on April 17, 1910. After living together about four months the wife left the husband against his protest and has refused his repeated requests for her return. In January, 1911, a bill for divorce *a mensa e thoro* was filed by the appellant against the appellee upon the ground of abandonment and desertion. An order of publication was issued against the defendant, who was living with her relatives in New York, and in default of her appearance a decree *pro confesso* was entered and testimony taken *ex parte*. The defendant subsequently appeared by counsel and filed a petition stating that she had no knowledge of the pendency of the suit until she was notified of the fact by the examiner who took the depositions, and asking that the interlocutory decree be rescinded and leave be granted her to file an answer. An order was passed in compliance with this request, and the defendant immediately filed her answer denying that she had abandoned

the plaintiff without just cause and averring that by reason of the plaintiff's conduct she was driven from his home. At the same time she filed a cross-bill for divorce *a mensa e thoro* from the plaintiff upon the ground that he had constructively abandoned and deserted her by permitting the existence of conditions which compelled the separation. It was charged that at the time of the defendant's marriage to the plaintiff she knew him to be a widower with three adult daughters, one of whom was married, and three sons, who were infants in law; that he maintained a comfortable home in Baltimore for himself and his five unmarried children; that he represented himself to be a man of large financial means and well able to take upon himself the additional obligations incident to the marriage upon which he was about to enter; that immediately after the marriage she was brought by the plaintiff to his home, where from the first she was subjected to indignities and insults by her husband's children, to such an extent as to impair her health and render it impossible for her to remain a member of the household; that the conduct of which she complains was permitted by the plaintiff without any interference on his part; and that her separation from him was thus made necessary and was not voluntary. The cross-bill prayed for alimony and counsel fees as well as for a partial divorce.

In his answer to the cross-bill the husband denies that his wife was forced to suffer any indignities or insults in his home, and alleges that her departure was without just or reasonable cause, and that he has since urged her repeatedly to return, but she has steadily refused.

An application was made by the wife for alimony *pendente lite.* This was not granted, but a counsel fee was allowed to the amount of one hundred dollars.

Evidence was adduced orally before the Court below, and it decreed that the husband's bill of complaint be dismissed, and that the relief sought by the wife's cross-bill be granted only to the extent of an allowance of alimony at the rate of ten dollars per week, to date from the hearing, and an addi-

tional counsel fee of two hundred and fifty dollars. Both parties have appealed. The husband seeks to have the decree reviewed in its entirety, while the wife's objection is that the amounts provided for alimony and counsel fee are inadequate. The primary question is whether the wife was legally justified in leaving and remaining away from her husband and is thus in a position to successfully meet his charge of abandonment and assert a valid claim for alimony.

At the time of their engagement the plaintiff had been a widower for ten months, and the defendant a widow for seventeen years. She was then living with her relatives in the City of New York, but had several years previously spent some time in the home of the plaintiff's married daughter in Baltimore, when she had become well acquainted with him and his family. The plaintiff first called on the defendant in New York on February 2nd, 1910, and at once proposed marriage. In referring to this event, the defendant testified: "When he asked me to be his wife I knew his wife had only been dead about ten months, and I told him it was only a short time, and I wanted to be sure his daughters and all his children were perfectly satisfied with that step. It was very important with me, because I knew what that feeling must be with the daughters. * * * Well, he said, it seemed like ten years his wife was dead, and he was very lonesome, but the children were very fond of me during the time they had met me, they liked me very much and he felt I would make a suitable wife and a good mother to his children. I told him I could not decide until I heard personally from the children." At his suggestion she wrote to them, and all except Lydia, one of the unmarried daughters, answered stating that their father's interest was their own, and indicating that they were satisfied with the projected marriage. The engagement followed within a few days. About a week later the defendant wrote the plaintiff that she had received a letter from Rose, the other unmarried daughter, and that while it was very respectful it showed "between the lines that she and all the children are quite

unsettled and very sad over our affairs." The defendant's letter proposed that the plaintiff provide a separate home in which they should live with the younger boys, apart from the daughters. This suggestion was not accepted.

The wedding occurred in New York after the parties had executed an ante-nuptial agreement providing for the payment of seventy-five dollars a month to the wife during her life or widowhood, in case she survived her husband, in lieu of any other marital interest in his estate. About a week later they arrived at the plaintiff's home in Baltimore. The defendant testified that during the four months of her residence there she was treated with great discourtesy by the two daughters of the plaintiff, who were living at home, and that he made no effort to control their conduct. In her testimony she makes some complaint of the boys also, but as she expressed her willingness to have them remain in the household and evidently did not leave on their account, her allusions to them need not be considered. The record leaves no doubt in our minds that the relations between the defendant and her stepdaughters were not as agreeable as they should have been, but the evidence is in conflict as to the extent of the unpleasantness and the responsibility for its existence. While Mrs. Buckner asserts generally that she was subjected to almost daily indignities, she has actually specified only a few instances, and these are relieved of the serious aspect she gives them by the daughters' explanations. A careful consideration of the testimony has convinced us that the stepmother did not meet the situation in the spirit of cordiality and conciliation which it obviously demanded. From the time of her entrance into the family she appears to have maintained an attitude of sensitive concern for her position as mistress of the household that could hardly fail under the circumstances to produce some unpleasant developments.

The first act of disrespect to which she refers occurred on the evening of her arrival. This was immediately preceding the Jewish Passover, and as the dining-room had been pre-

pared, and was to be left undisturbed, for that ceremony, according to the Jewish law and custom which the family observed, it happened that the first meal provided for the new wife was served in the kitchen. To this she promptly took exception, complaining to her husband when they retired that it was "a very funny reception for a bridal couple." The next "rumpus", as she termed it, occurred when her husband handed her a sum of money for table expenses in pursuance of an arrangement they had previously made as to a weekly allowance for that purpose. One of the girls objected to this on the ground that their mother had not received such an allowance, and that their father had told them there would not be any change in the home, "just a different face." Mr. Buckner then asked his wife not to insist on the arrangement, but she testifies that she said: "Why not; I am your wife; I have a right to it. He said: 'You have a right to it, but the children do not like it; they do not approve of it, and for peace sake, give it up." I says: 'For peace sake; you will tell the children to give it up; they have nothing to do with this; you tell them our compact was made, and you made this promise to me, and they have no right to interfere." When they were alone she told him that if he did not decide in her favor, she would take no interest in his home at all and would be there just as a boarder. He said: "Don't be so sensitive, the children will be married soon, and then you can have everything your own way." Mrs. Buckner testified that nearly every evening she had "this argument" with her husband, and that she gave up her interest in the home and lived mostly in her room.

Another complaint was that if her husband would just put his hand on hers at the table the children would make some insulting remark, but the only such utterance specified was attributed to the married daughter, who was there simply as a transient visitor and by whom it was explicitly denied. Once at the table Lydia got into a quarrel with her little brother and threw some water at him, part of which fell

on Mrs. Buckner's dress. She was greatly shocked and demanded of Mr. Buckner to know whether this was what he called a happy home. On another occasion the girls "started right in to slander unmercifully" some friends of Mrs. Buckner, who had telephoned that they were coming to call. In the evening when she wanted to go into the parlor she found the door locked. Mr. Buckner was with her, and called Lydia to know why she had locked the door, and she replied that it was because the parlor had been cleaned that day and said "when her company comes she can take them out on the street." Mr. Buckner said he would get the key and open the door. Mrs. Buckner said "that is all right, but are you going to allow her to insult me like this." He said, "She did not mean it that way."

In July Mrs. Buckner told her husband she would like to go home to visit her people. He made no objection and gave her money for her car-fare. This was not used, but was left by Mrs. Buckner enclosed in a note to her husband in which she said: "You do not know or understand how very homesick I have been and how great a change I have made in my life here with you, but if you will try to forgive all the unpleasantness we have had together, I believe I will be much happier after I have seen my folks again. I know you meant everything for the best, but you did not know all my habits and what I have been accustomed to, but I have promised to be your wife and I solemnly mean to be a faithful one, if you will just make allowance for the difference in our habits."

When Mrs. Buckner returned to Baltimore, on August 17th, Lydia had taken a position with the Educational Alliance of Homes for Girls which kept her absent from home the greater part of each day for some weeks, and during this period the stepmother and Rose looked after the household affairs together quite amicably. After Lydia gave up her position "she started right in," said Mrs. Buckner, "finding fault with my work." "I remember," said she, "once she was getting up a dinner for someone, and I wanted to help

her, and I asked her if there was anything I could make
for the supper. She said, "No, I shall not need your help."
I went out of the kitchen and I made up my mind that I
would not go in it again while she was there." About this
period Mrs. Buckner suggested to her husband that the meals
ought to be served at more regular hours, and asked him to
make this suggestion to the girls. Lydia came in at this
juncture and said to her father, "I am not taking any sug-
gestions from your mistress; if she wants the dinner on
time she can get it herself." This was denied by Lydia
in her testimony. That night Mrs. Buckner told her hus-
band that she would not live under the same roof with the
girls, and that he would have to give her a separate home,
but that she was willing to have the boys remain with her as
members of the family. Mr. Buckner said he would not
part from his children for any woman. The subject was
repeatedly urged by Mrs. Buckner, but her husband would
not make the change she proposed. Another unpleasantness
mentioned in her testimony happened on an occasion when
she was invited out to dinner by some of her friends. The
girls said to their father that his wife was very disrespectful
to him in accepting an invitation without her husband. "He
might have told them," she testified, "that it was not any
of their business, and he had agreed with me that I could
go. Instead of that he said that perhaps he was not wanted
and that this did not seem to show much respect." She
insisted that he had consented to her going, and complained
of his allowing the girls to interfere, and he said, "Well, I
will call for you and it will be all right; don't let it disturb
you any further."

The night before the separation the daughter who usually
attended to the table served all the others at dinner except
her stepmother, to whom she simply pushed the platter.
That evening Mrs. Buckner declared she could stand it no
longer, and the next morning she started to pack her trunk.
"Mr. Buckner," she said, "was wild. He was walking the
floor in great excitement. He said, 'Are you really in ear-

nest? I said 'Certainly I am, and I am going to give you one more chance before I lock my trunk. Will you give me a home aside from your daughters? Will you protect me and care for me as you promised to do and give me a home away from these girls?" He says, "No, I would rather see you dead." Mr. Buckner had called in his married daughter to plead with his wife to remain, and when her efforts proved unavailing she made, according to Mrs. Buckner's testimony, some very unpleasant remarks. "He says my daughter is excited, she does not know what she is saying." "So I says now I will lock my trunk. He says, if this trunk goes out of this room it will be forever. I says, that is just what it will be." Mrs. Buckner then took her departure and went to her daughter's home in New York. Her trunk having been retained by her husband she wrote him requesting that it be forwarded to her with her other effects which she had not been able to pack. He replied immediately that he had withheld the trunk simply because he knew she was excited and in a temper when she left and he thought that by the time she reached New York she would have calmed down and regretted the step she had taken, and that he would hear from her to that effect. "You know Bella," the letter continued, "that you are acting very unjustly and do not see that how I have acted was as any true and loving husband and father would act. Remember that you are a mother, but did not display a motherly feeling when you expected my daughters to wait on you hand and foot. * * * Think of this, and see if you are entirely free from blame." This letter was promptly answered by one from Mrs. Buckner in which she told her husband that he had held out no prospect of a change for the better and that she would remain where she was until he could make a home for a wife when he needed one. "Your daughters," said she, "are the bosses; now let them keep their places as such until they marry." She asked again for her trunk and effects and they were then forwarded.

A further correspondence ensued in which the husband persistently entreated his wife to return and she asserted that she had been insulted and abused by his daughters and was determined to remain away "until the girls are married and you can give me a home where I will be mistress without interference, and with all the comforts of life you promised me, as I do not intend to be a *drudge* in my old days, for I never had to work hard in my younger years." In addition to urging by letter his wife's return, Mr. Buckner went in person to New York and had two interviews with her, the first being on September 21st at her daughter's home, and the second on October 16th at the residence of Rabbi Hirsch. In her account of the latter interview Mrs. Buckner testified that her husband told her that his daughters had promised not to interfere any more. "Of course," said she, "I told him that was not enough, that I had stated before I left that I would not return under the same roof with those girls." Mr. Buckner declared that he would not give up his children for a hundred wives. In a letter written by Mr. Buckner to his wife's brother, and which was shown to her, after the first meeting just referred to, he said: "As far as disputes between Bella and Lydia are concerned, they were merely because our house is a strictly Kosher one and Lydia tried to show Bella what I was accustomed to and not as Bella had lived. The children bear Bella no malice and anything that has happened between them was only to show her some error of which she could not be convinced. If she is willing to accept what I tell you in the spirit in which it is written, then I am willing to forget and forgive the past and start all over again as if we were just married yesterday, but God knows I cannot sacrifice any of my children, whom I saw brought into the world, watched them grow to big boys, men and women, children whom I love and have toiled for all these years, each one in his way the apple of my eye, that is entirely beyond me." On the following day Mrs. Buckner wrote her husband in reply to this letter and complained that he was still defending his daugh-

ters against his wife. "I am sure," she wrote, "that your boys have no complaint to make against me, and I know I could manage very well with them, but shall never go back to you as long as your daughters are at home." On November 25th Mr. Buckner wrote his wife promising to give her a weekly allowance of $20.00 or more to run the house if she would come home, and enclosing a check for the trip, but this did not induce her to return. In the latter part of December he sent his son-in-law, Mr. Hollander, to see Mrs. Buckner with a view to an amicable adjustment. In their interview it developed that she had consulted a lawyer, and they repaired to his office, where the question of a possible pecuniary settlement was discussed. No agreement of any kind having been reached, Mr. Buckner about a month later made his pending application for a partial divorce.

After the Court below had heard the case and expressed its views, but before the decree was entered, the husband made a final effort to bring about a reconciliation with his wife by offering to provide a home apart from his daughters. This overture was rejected.

The plaintiff's bill was dismissed upon the theory that the defendant's withdrawal from her husband's home and her refusal to return were legally justifiable. We have been unable to reach this conclusion upon the evidence. If it be assumed that ordinarily such occurrences as those to which the wife has testified would be sufficient in themselves to justify her in living apart from her husband, we have here to consider the important fact that the defendant, with full knowledge in advance of the marriage that her prospective husband would not give up his daughters as she had proposed, and with thorough appreciation of their sensitiveness to her presence in the place their deceased mother had so lately filled, voluntarily assumed whatever possibilities of discord the situation offered, and then contributed by her own attitude in the home to the domestic difficulties of which she complains. In view of these conditions we do not think that the acts of discourtesy to which she refers were suffici-

ently serious to entitle her to demand the separation of the father from his daughters as an absolute and peremptory condition of the performance of her marital obligations.

This would be our view of the case upon the wife's own version of the incidents she mentions, but the testimony of the daughters presents the circumstances in a very different light. They deny the general charges of their stepmother, and their account of the episodes which she characterizes as indignities and insults would indicate that she has unduly magnified her grievances. The husband testified that his wife's complaints to him referred more to "money matters" than to the conduct of the children.

The question as to how far a wife is justified in leaving the marital abode on account of the conduct of her husband's relatives, living in the home, has been considered in a number of cases which are collected in notes to *Brewer* v. *Brewer* (Neb.), 13 L. R. A. (N. S.) 222, and *Hall* v. *Hall* (W. Va.), 34 L. R. A. (N. S.) 758. The Courts have naturally refrained from attempting to formulate a rule of general application in such cases, but have acted upon the theory that each should be determined upon its own particular circumstances. In none of the decisions, in this jurisdiction or elsewhere, do we find a precedent for holding, upon such facts as are here proven, that the separation should be sanctioned either with a view to the allowance of alimony to the wife or the justification of her departure as against the charge of desertion. This Court has consistently held that the law will not countenance the living apart of the husband and wife except for grave and weighty causes. *Taylor* v. *Taylor,* 108 Md. 134; *Childs* v. *Childs,* 49 Md. 509; *Hawkins* v. *Hawkins,* 65 Md. 104; *Schindel* v. *Schindel,* 12 Md. 294; *Jamison* v. *Jamison,* 4 Md. Ch. 294; *Hewitt* v. *Hewitt,* 1 Bl. 101; *Helms* v. *Franciscus,* 2 Bl. 568. In this case it seems clear to us that no such causes have existed, and as it is shown without dispute that the wife left her husband against his protest and has rejected his importunities for her return, notwithstanding his assurance that the

grounds of her dissatisfaction would be removed, we cannot sustain her contention that his conduct is responsible for their continued separation. Desertion as a marital offense consists in the voluntary separation of one of the married parties from the other, or the refusal to renew suspended cohabitation, without justification, either in the consent or the wrongful conduct of the other party. *Taylor* v. *Taylor,* 112 Md. 669; *Gill* v. *Gill,* 93 Md. 654; *Bishop on Marriage, Divorce and Separation,* Vol. 1, secs. 1662-3. In our view of the case the allegation in the plaintiff's bill of complaint that he has been deserted and abandoned by the defendant is supported by the evidence and he is entitled to a divorce *a mensa e thoro* upon that ground, as provided by our statute. *Code,* Art. 16, sec. 37. This conclusion necessarily disposes also of the question of alimony, as such a provision could not justly be made in favor of a wife who lives apart from her husband against his objection and without sufficient cause. The allowance of counsel fee to the defendant's solicitor in our judgment was proper and adequate under all the circumstances of the case.

> *Decree reversed in part and affirmed in part and cause remanded, to the end that a decree may be entered in accordance with this opinion, Louis Buckner to pay the costs of both appeals.*