CLAUDE ALBERT CHABEAUX *v.* RUTH
CHABEAUX.

[No. 14, January Term, 1933.]

*Decided March 20th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*A. Theodore Brady* and *William H. Lawrence,* for the appellant.

*J. Purdon Wright,* with whom was *Samuel Carliner* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married at Staten Island, N. Y., June 15th, 1905, and lived there about six or seven years. They then moved to Washington, D. C., where Claude Albert Chabeaux, the appellant, obtained employment as a stereotyper in the United States Government Printing Office, and lived in that city together as husband and wife until the latter part of May, 1921, when Ruth Chabeaux, the appellee, went to live with her mother at 252 Westervelt Avenue, Staten Island, and her husband went to board with Edward A. Kerr, an assistant superintendent in the office where Chabeaux was employed. After that separation Chabeaux at more or less regular intervals sent money to his wife for her support until July, 1923, when the payments ceased. On November 18th, 1929, Chabeaux, who had established a residence in Anne Arundel County, Md., filed in the Circuit Court for that county a bill of complaint against his wife as a non-resident, in which he alleged that the defendant had deserted him, that the desertion had continued for the statutory period, had been continuous, and was final and beyond hope of reconciliation, and he prayed that he be divorced *a vinculo matrimonii* from the defendant, and that the defendant be notified by publication of the substance and object of the bill. An order of publication was passed, a decree *pro confesso* entered in ordinary course, testimony was taken, and on May 9th, 1930,

a final decree was passed granting the plaintiff an absolute divorce from the defendant.

On November 14th, 1930, Mrs. Chabeaux filed in the case a petition to vacate that decree on the ground that it had been procured through the fraud of Chabeaux, and that Chabeaux was not a *bona fide* resident of Anne Arundel County. Chabeaux answered the petition and denied the alleged fraud, and on the first of the following April the court, after a hearing, struck out the decree with leave to the defendant to answer within fifteen days. She did answer, and in her answer alleged that she and the plaintiff had separated by common consent, and that she had not deserted him. She then filed a cross-bill, in which she alleged that Chabeaux had deserted her, that the desertion had been continuous for more than three years, and she asked that she be divorced *a vinculo* from the cross-defendant and awarded suit money, alimony *pendente lite,* and permanent alimony. Chabeaux in turn denied the allegation that he deserted the cross-plaintiff, and further alleged that "as the defendant, Ruth Chabeaux, has denied that he is a resident of Anne Arundel County, State of Maryland, which denial raises the question of jurisdiction, he is advised that if this court has no jurisdiction in this matter, that he should not be required by an order or decree of this court to pay her alimony and counsel fees before the jurisdiction of this court is established." The case was tried upon those issues, and after evidence and a hearing the court, on June 20th, 1932, granted the relief prayed in the cross-bill, divorced the cross-plaintiff from the cross-defendant, and awarded her as permanent alimony thirty-eight dollars per month. This appeal is from that decree.

The theory upon which the respective parties rely for affirmative relief is not wholly clear from the record. Chabeaux under the decree *pro confesso* gave this testimony: "9. Q. When did you and your wife part, and who left the home? A. My wife left on May 28th, 1921. 10. Q. Where were you living when she left you? A. At 231 Rhode Island Avenue N. W., Washington. 11. Q. Why did your wife leave

you? A. At the time my wife left me we were living at the address stated above, and we were looking for a new home. In the meantime my wife left me and went to her home in Staten Island, and she has never come back. 12. Q. Can you state to the court why she did not come back? A. She claims I did not have a satisfactory home. 13. Q. Were you supporting her to the best of your ability at that time? A. I was. 14. Q. Have you seen or heard of your wife since then? A. I have not heard from her directly, but I have heard in an off-hand way. 15. Q. And as I understand you, Mr. Chabeaux, the reason for her not coming back was that she was dissatisfied with her mode of living at the time you were living together in Washington, is that right? A. Yes, sir. 16. Q. Any other reason? A. Not that I know of."

But it appeared not only from the testimony of Mrs. Chabeaux, but from his testimony taken at a later stage in the proceedings, that the testimony quoted was, to say the least, misleading. The distinct impression left by what he said is that Mrs. Chabeaux left him voluntarily while they "were looking for a home," and did not come back because she was dissatisfied "with her mode of living" at the time they were living together in Washington. Mrs. Chabeaux, referring to the separation in 1921, said: "At our residence, the owner of the house wanted to occupy the house and he told us he would like to come in on May 1st, he gave us notice on April 1st, 1921. Then I looked around for an apartment and we could not decide, Mr. Chabeaux did not want this one and that one, and then I had the time extended to the first of June, and we did not find an apartment to suit him, and I asked him if he wanted to go light housekeeping, and he said, 'No,' and he said, 'Suppose you put the things in storage and go to your mother's and I will look around until I find a place,' and so we put the things in storage and I went to my mother's, that was the end of May, 1921." And Chabeaux, examined at the final hearing gave this testimony: "Your wife has filed in this proceeding a bill known as a cross-bill she asking for relief instead of the court giving it to you, and now you are answering it. When your wife went to New York about

1921 was that by a mutual agreement? A. Well, in some ways it was and some ways it was not. I asked her to look up a place, a room or rooms before she left. 2. When she went to New York was that by mutual agreement. A. Yes, because we could not find any place. 3. As I understand by your wife's and yourself, in your testimony, according to the testimony you were renting from some one in Washington? A. Yes. 4. And they wanted their property? A. Yes. 5. That was the cause of your being in the position you were as to no home? A. Yes. 6. Was it your understanding your wife was to come back from New York and live in Washington with you? A. Yes."

And when cross-examined on his testimony taken under the decree *pro confesso* he said: "You answered in your testimony in this case, in answer to the question, 'When did you and your wife part, and who left the home,' you said 'my wife left on May 28th, 1921,' you meant she went to her mother's after you and she had talked it over? A. Yes. 2. You did not say that here. In answer to question, 'Why did your wife leave?' you said, 'At the time my wife left, we were living at this address, and we were looking for a new home, and in the meantime my wife left and went home to Staten Island and has never come back.' As a matter of fact she had come back? A. Not to live. 3. You gave the court the impression by that answer that she never came back? A. I did not understand it that way. 4. You were then asked why she did not come back, and you said 'She claims I did not have a satisfactory home'? 5. That is all modified by the testimony given? A. Yes."

It is manifest from that testimony that when the parties separated in 1921, neither of them intended by the separation to terminate the marital relation. So much at least is clear, but from that point on, the evidence is in part conflicting and entirely too vague, indefinite, and confused to afford a sufficient basis for affirmative relief of any kind to either party.

Chabeaux in his later testimony attempted to fix the date of the supposed desertion in the spring or summer of 1924,

when, he said, his wife refused to live with him in an apartment which he had leased and occupied, but his statements are far from convincing. From the time of the separation until July, 1923, Chabeaux contributed forty dollars a month to his wife's support while she was living with her mother at Staten Island, and he visited her there, at least twice, once in 1921 and once in July, 1923. On the latter occasion, he said that he went "to take her home with me and she refused to come," but he admitted that at that time he had no "home" to which to take her, and that he did not expect her to "leave right away" if she had consented to come. And while he said that the "home" he meant was his "place" in New Jersey, he said that he did not intend to stay there but that he expected to take his wife from there to Washington. He further testified that after that visit he made no further contribution to her support, and neither saw nor communicated with her until the following spring or summer. In the meantime, however, Mrs. Chabeaux had employed counsel to compel her husband to contribute to her support and he wrote Chabeaux on her behalf. Chabeaux at once took the matter up with a friend of his, an attorney in Washington, and on his advice leased an apartment at 1718 First Street N. W., Washington, for a term of eleven months beginning November 1st, 1923, and he testified that his attorney notified Mrs. Chabeaux of what he had done. The record does not disclose what that notice was, but it may be fairly inferred that Chabeaux did not invite his wife to occupy the apartment until 1924, when she saw him in Washington. Chabeaux said that on that occasion: "She called me up and wanted to have an interview with me, and I drove up to Mrs. Boyer's and I offered her the keys and all she said was, she refused the keys, and said she was not satisfied with that, and all she wanted was her freedom, and she told me then I was not man enough to give her her freedom, and I told her I could not do that in Washington—she knew of the charges * * *." And he further testified that she said that she would not live with him anywhere under any circumstances. But she gave a different account of the interview. She said: "I called

Mr. Chabeaux up and he said he would have to consult his lawyer before he could see me, and he called back and we went out and I asked what his intentions really were and he said, 'I have an apartment if you want it,' and I said, 'You really don't mean it.' I said, 'Will you be different and change your way of living?' He was in the habit of drinking liquor, he would come home in the evenings and just go to sleep, and be rather embarrassing for me, and he said he would not promise me anything, and I said, 'You will have to promise me something or I can't come to live with you.' I said, 'You promise to stay home and promise to give up a certain party,' and he said, 'No, I promised to be a life long friend and I am not going to give up anything.' * * *

"Did you go to see this apartment he claims to have rented? A. Yes; 1718 First Street N. W., Washington. What kind of a neighborhood was it in? Neighborhood occupied by colored people principally; not the apartment but all around First Street, N. W., Washington. So then you went back; at the time you told him if he would not give up Miss Kerr, was there any conversation about your going back to your mother's again? No; Mr. Chabeaux would not give me any satisfaction. I said, 'Drive me back to Mrs. Boyer's,' and I left him there, and that was the last conversation I ever had with him."

Shortly after he and his wife separated, Chabeaux bought a lot of ground at Herald Harbor, Anne Arundel County, and in 1927 erected a bungalow on it. One of the issues in the case was whether Anne Arundel County or Washington was his legal domicile. Chabeaux in connection with that issue testified that he was a registered voter of Anne Arundel County and had been, for more than two and one-half years prior to April 4th, 1930, a resident of that county. And while the evidence casts some doubt upon the good faith of his alleged domicile in Anne Arundel County, it was too fragmentary and incomplete to justify this court in reversing the decision of the chancellor on that issue.

Mrs. Chabeaux's account of the relations between her and her husband subsequent to their separation in 1921 differs in

some respects from that of her husband, and there is some attempt at corroboration of their respective statements. But, without analyzing it in detail, it is sufficient to say that the evidence is insufficient to meet the requirement for affirmative relief in cases of this character. Considered as a whole, it establishes these facts: (1) That the parties separated by common consent in 1921, and that until 1923 Chabeaux contributed to his wife's support; (2) that since that time he has made no contribution to her support other than payment of alimony pending this suit; (3) that since their separation she has never requested him to resume marital relations with her, although (4) she has demanded (a) that he contribute to her support, or (b) supply a home in which she might live with him upon the condition that he discontinue his "relations with Miss Kerr"; (5) that Chabeaux at no time since their separation requested his wife to resume marital cohabitation with him; and (6) that he brought this suit in the expectation or hope of securing an absolute divorce without the knowledge of his wife, and without affording her an opportunity to defend it.

The only one of these findings as to which there can be any substantial question is the fifth. In connection with that Chabeaux's contention is that he did in good faith offer to resume marital cohabitation with his wife at an apartment which he had leased and furnished. Her reply to that contention is that his offer was not made in good faith. The chancellor so found, and we concur in his conclusion. It is apparent from the evidence that Chabeaux made no real effort to find an apartment prior to the fall of 1923. He does indeed speak of the difficulty of finding an apartment or home in Washington prior to that time, but it is significant that, as soon as his wife demanded that he support her, and he was informed by his attorney that in answer to that demand he should offer her a home, he almost immediately found one. She said that the home he provided was in a part of the city largely occupied by negroes, and while the witness Kerr said that it was a white neighborhood he also stated that it had since "gone colored." But apart from that consideration,

it is apparent that a husband who had procured an apartment as a technical defense to his wife's demands, and who long after he had procured it did not feel at liberty to see or speak to her without his lawyer's permission or advice, cannot be said, in inviting her to occupy it, to have offered her in good faith a home. At the time the offer was made, it appears from his own testimony that, since she left Washington at his request in 1921, he had never communicated with his wife, nor voluntarily seen her except on two occasions, and he offered neither explanation nor excuse for that long continued neglect. There was nothing in his conduct to assure Mrs. Chabeaux that he wished to resume their marital relations, that he was willing to do so, or that his offer was anything more than a gesture which could be used if she refused it as a defense to any demand she might make for support. The refusal of such an offer is not an act of desertion. *McClees v. McClees,* 162 Md. 80, 158 A. 349; *Nelson on Div. & Sep.,* sec. 74; 19 *C. J.* 66. Apart from that, Chabeaux never at any time offered to resume his former relations with his wife. He did testify that in the summer of 1923 he saw her on Staten Island and offered to take her home with him, but that she would not go, but it appears from his own testimony that at that time he had no home to which she could go, for he said that, although he was looking for an apartment, he was unable to obtain one until the following fall. She denied that he ever made any such offer, and his statement that he made it is not corroborated except possibly by Edward A. Kerr, who testified that at some time, not definitely fixed, after the separation, Mrs. Chabeaux said that she would not return to her husband. Chabeaux boarded with Kerr, was under his supervision in the printing office, and was on the friendliest terms with him and his family, but there is nothing apparent in their relationship to justify his interference in the domestic affairs of Mr. and Mrs. Chabeaux. Mrs. Chabeaux denied that she had the interview to which Kerr testified, and the circumstances rather support her. From his own statement Kerr had not the slightest authority from Chabeaux to negotiate with Mrs. Chabeaux

for her return to him, and, while Chabeaux and his wife were living apart, they both state that the separation was for convenience, by common consent, and was not due to any quarrel or domestic differences, and there was no possible reason why either one was not at liberty to have discussed a reunion with the other, or why Kerr should have felt at liberty to advise Mrs. Chabeaux to return to her husband, who had not authorized him to make the suggestion. Kerr's *ex parte* testimony, taken under the decree *pro confesso,* differs materially from his testimony when recalled for cross-examination, and his bias is sufficiently manifest to weaken the force of his testimony. Without further elaboration, we have no difficulty in deciding that upon all the evidence Chabeaux failed to meet the burden which he assumed in the original bill, of showing that, after they had separated, he in good faith offered to resume marital relations with his wife, and that his bill should have been dismissed.

We are unable, however, to concur in so much of the decree as granted a divorce *a vinculo matrimonii* to the appellee. It is conceded that the parties first separated by mutual consent, and, in such a case, the general rule is that it will be presumed that the separation continues by mutual consent until one of the parties withdraws the consent and offers in good faith to resume marital cohabitation, 19 *C. J.* 64; *Nelson on Div. & Sep.,* sec. 67; *Keezer on Mar. & Div.,* sec. 336; *Walker v. Walker,* 125 Md. 649, 94 A. 346, and the mere fact that the parties are living separately will not under such circumstances support an inference that either one deserted the other. *Ibid.*

And as the record in this case fails to show that Chabeaux ever made in good faith an offer to resume marital cohabitation with his wife, so it also shows that she has never at any time made an offer to resume marital cohabitation with him. She demanded that he contribute to her support or provide an apartment for her, but she went no further than that, and that she did not intend that demand as an offer to resume marital cohabitation is apparent when, in reply to his statement that "I have an apartment if you want it," she said,

"You really don't mean it. * * * will you be different and change your way of living?" and stipulated as a condition precedent to her coming to live with him that he promise to give up "a certain party." She testified that the "way of living" to which she referred was his drinking habits, and his relationship with a Miss Kerr. But the record shows no justification for the condition. There is nothing in the record to excuse the insinuation that Chabeaux's relations with Miss Kerr were improper, and Mrs. Chabeaux herself, while she later qualified the statement, said that she did not know whether her husband "had touched a drop of liquor or intoxicants since prohibition." In attaching that condition to her offer Mrs. Chabeaux either went too far or not far enough. If it was unjustified, it was needlessly insulting; if it was justified, she should have shown that fact, which she failed to do. In either event, that she made it indicated a want of good faith, and an absence of a conciliatory disposition, which boded ill for their domestic happiness if her offer was accepted, and which took from the offer the effect it otherwise would have had. Other than that offer, there is nothing in the case to indicate or show that she ever withdrew her consent to the separation, or that she was willing to resume marital cohabitation with her husband. Under such circumstances the separation continues as it began by common consent, and her cross-bill should have been dismissed.

> *Decree reversed; original and cross-bills dismissed; appellant to pay the costs above and below.*