LE ROY H. DEARHOLT *v.* MYRTLE C. DEARHOLT
[No. 55, April Term, 1940.]

*Decided May 23rd, 1940.*

The cause was argued before OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Simon Silverberg* and *Sigmund Levin,* with whom were *Silverberg & Silverberg* on the brief, for the appellant.

*Philander B. Briscoe,* with whom were *Briscoe & Jones* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This court, on November 16th, 1938, in the case of *Dearholt v. Dearholt,* 175 Md. 694, 2 A. 2nd, 428, reversed a decree of the Circuit Court of Baltimore City, awarding the appellee, Myrtle H. Dearholt, permanent alimony. As a basis for that decision it found from the evidence that the appellee had failed to prove with the requisite certainty (a) that the parties were in fact separated, (b) or, if they were, that the husband caused the separation.

Prior to and pending that litigation, the parties lived apart, and they continued to live apart until June 17th, 1939, when Mrs. Dearholt filed the bill of complaint in this case against Leroy H. Dearholt, her husband. In that bill she prays a divorce *a mensa,* and the allowance of permanent alimony, on the ground that her husband

without just cause abandoned and deserted her, and has refused to contribute to her needs, although she is without property, income, or means of support. The husband denied the desertion, and denied that his wife had no means of support. The case was tried on evidence and the pleadings, and at the conclusion of the hearing the court signed a decree divorcing Mrs. Dearholt, the appellee, from her husband and awarding her as permanent alimony six dollars per week. From that decree the husband has appealed.

The question in the case is whether since the former suit the husband has been guilty of conduct justifying the relief granted by the decree.

Dearholt is a World War veteran, at present employed as a clerk in the United States postal service at a salary of $2,100 per annum, with occasional extra compensation, and he receives in addition to that a pension from the Federal Government of about twenty-six dollars per month. He owns several leasehold properties subject to ground rents and mortgages, two unimproved lots at Riviera Beach, and an interest in a house on Lanvale Street in the City of Baltimore and in a house on East Twenty-second Street, which apparently are held by him and his mother as joint tenants. At the time of the hearing he was forty-three years old. He was wounded in the war and still has a bullet in his pleural cavity. He is nervous, excitable, easily confused, and his counsel stated in open court, as though it were undisputed, that "he is mentally unsound."

The wife is in poor health, has high blood pressure, is subject to fits, and because of her physical condition is unable to find employment. She appears to be nervous, friendly, anxious to please, but easily upset withal.

That this ill assorted and ill matched couple found it difficult, if not impossible, to adjust themselves to each other in the intimate relations of married life is not surprising. Neither had the mental or the spiritual capacity to make necessary allowances for the other's frailties, so almost inevitably they came to a point where

they could not live together and they separated. There is no suggestion in the case that either has been guilty of adulterous or incontinent conduct nor, except in one instance to which reference will be made later, does it appear that either accuses the other of violence, or abusive language. The fact remains, however, that they are living apart, and each charges the other with responsibility for that separation.

When the parties separated in '1934, they were living on Parklawn Avenue in the City of Baltimore. The husband left that home and did not return, but this court, in *Dearholt v. Dearholt, supra,* decided that the evidence then before it was not sufficient to show that the parties had in fact separated or that, if they had, that the separation was caused by his fault. Because of that adjudication the court is precluded in this case from the consideration of anything as a ground for the relief prayed except the conduct of the parties after that suit was instituted.

They were then married but living apart. The wife was then living with her mother and still lives with her, while the husband lives in a home of his own.

Assuming that the parties were living apart before the former suit, without fault for the separation chargeable to either, nevertheless each was under a duty to make reasonable efforts to effect a reconciliation, and neither could charge the other with desertion unless he or she had honestly and in good faith made such an effort. As stated by Judge Urner for this court in *Buckner v. Buckner,* 118 Md. 101, 84 A. 156. "This court has consistently held that the law will not countenance the living apart of the husband and wife except for grave and weighty causes. *Taylor v. Taylor,* 108 Md. 134, 69 A. 632; *Childs v. Childs,* 49 Md. 509; *Hawkins v. Hawkins,* 65 Md. 104, 3 A. 749; *Schindel v. Schindel,* 12 Md. 294; *Jamison v. Jamison,* 4 Md. Ch. 294; *Hewitt v. Hewitt,* 1 Bl. 101; *Helms v. Franciscus,* 2 Bl. 568. * * * Desertion as a marital offense consists in the voluntary separation of one of the married parties from the other or the re-

fusal to renew suspended cohabitation, without justification, either in the consent or the wrongful conduct of the other party. *Taylor v. Taylor*, 112 Md. 669, 77 A. 133; *Gill v. Gill*, 93 Md. 654, 49 A. 557; 1 *Bishop on Marriage, Divorce and Separation*, secs. 1662, 1663." And while no general rule applicable to all cases can be formulated to measure and define that duty (*Wise v. Wise*, 159 Md. 596, 601, 152 A. 230; *Chabeaux v. Chabeaux*, 164 Md. 370, 378, 165 A. 301; *Buckner v. Buckner, supra*), nevertheless, the refusal of an offer of reconciliation made by one spouse to the other, when both are living apart without fault chargeable to either, if made in good faith in an honest and sincere effort to bring about the resumption of marital relations, and where the circumstances do not justify a reasonable belief that acceptance of the offer will endanger or humiliate the spouse to whom the offer is made (*Sheehan v. Sheehan*, 156 Md. 656, 660, 145 A. 180; *Downs v. Downs*, 154 Md. 430, 434, 140 A. 831, 832), may be accepted as sufficient proof of desertion. For, as stated in *Downs v. Downs, supra*: "A refusal to renew suspended marital relations, without justification, constitutes desertion. *Gill v. Gill*, 93 Md. 654, 49 A. 557; *Taylor v. Taylor*, 112 Md. 669, 77 A. 133; *Buckner v. Buckner*, 118 Md. 101, 84 A. 156; *Muller v. Muller*, 125 Md. 72, 93 A. 404; *Heinmuller v. Heinmuller*, 133 Md. 491, 105 A. 745; *Barnett v. Barnett*, 144 Md. 184, 125 A. 51."

Much of the evidence relates to occurrences prior to and pending the former suit. Since any decree in that case must have been based upon acts, conduct, and transactions occurring before the institution of the suit, such matters are not relevant to the present inquiry. On the other hand events occurring during the pendency of that suit and subsequent to its final determination are relevant and material, *Carter v. Carter*, 139 Md. 265, 271, 114 A. 902; *Schwab v. Schwab*, 96 Md. 592, 595, 54 A. 653; *Wagner v. Wagner*, 130 Md. 346, 348, 100 A. 364; *Nelson on Marriage, Divorce and Separation*, sec. 740; *Bishop on Marriage, Divorce and Separation*, sec. 567.

The evidence leaves no doubt that in that period Dearholt never voluntarily made any effort to effect a reconciliation. On the other hand it permits no reasonable doubt that Mrs. Dearholt has made repeated efforts to effect a reconciliation, but that her offers and efforts were unsuccessful, not because the husband doubted that they were made in good faith, but because he did not want to live with his wife.

She said that in December, 1938, she went to see him at his home on Barclay street three times, that on two occasions she met him as he was leaving his house or entering it, that on one occasion she asked him if she could not talk to him for a few minutes, but that he walked away and closed the door in her face, that on the other occasion he did stand still long enough for her to ask him "if he would come back and why we don't try to get together, and all that sort of thing," and when she had concluded he said, "Have you finished?" and when she said "Yes," he walked into his house; that shortly after that the husband applied to a police magistrate for a warrant for her arrest on the ground that she was annoying him. Upon that application she was summoned to the police court and when she went there in obedience to the summons she found Dearholt and his attorney, and she said the attorney told the magistrate on that occasion that "this woman has been annoying her husband" and that the husband did not want her but did want her to keep away from him. On May 15th, 1939, she wrote her husband a letter, and on May 26th, 1939, she wrote to him again. She said she wrote to him because she had been warned "not to go near him." In the letter of May 26, 1939, she said: "Dear Roy: I want to see you. I must see you. Won't you please let me know where and when I may, or why not come out here some morning on your way home from work. Roy please consider this letter and come out here sometime soon or let me know, somehow, where I can see you. I will be waiting patiently for some word from you. Myrtle." On June 2nd, 1939, she received from his attorney a let-

ter in which the writer said: "Dear Madam: Mr. Dear-
holt complains that you are annoying him by letter and
otherwise, and requested the writer to inform you that
this must stop or else appropriate proceedings will be
instituted. I sincerely trust that you will make further
action unnecessary." Her testimony was corroborated
in part by her mother, the correspondence, and the mag-
istrate, and there was no real contradiction of it by the
husband. His testimony was rambling, confused, con-
flicting, and excusatory. Referring to the proceeding
before the police magistrate, he testified: "As to whether
I had my wife arrested this last January, 1939, I didn't
have her arrested. I went to the Central Station House
to Judge Miller, who sits there, last January, 1939, and
issued a proceeding against my wife. It was my request
for the wife to keep from causing me bodily injury,
which she has so often threatened to do, and which was
the reason of our separation. As to what proceeding I
got out upon that occasion, I know what it was. The
Judge ordered my wife to leave me alone and upon my
wife's request, he asked me to leave her alone. * * * Mr.
Silverberg absolutely did not make a statement to the
court in my behalf to the effect that I did not want Mrs.
Dearholt. As to Mr. Silverberg using the language ap-
proximately, 'This man—meaning me—does not want
this woman,' there were words to that effect, but you
have not finished the statement. The case was dismissed
with warning to both parties. I did not tell his Honor,
Judge Miller, that I did not want my wife any more,
upon that occasion. I absolutely deny that. As to
whether I said anything to that effect, it is according to
what you mean 'to that effect.' I can't understand those
questions. I did not tell Judge Miller that I did not want
my wife any more. As to my wife visiting me any more,
I did not say anything at all, but what I said I wanted
my wife to keep from injuring me bodily. * * * My wife
has positively not been calling on me at my home. She
waited outside of my home as I went into my home. I
can't say the exact date of that. If you are under the

strain I am under for the last seven years, I don't think you would remember much either. As to whether it was December, 1938, my wife called upon me that I complained about, I can't say for sure. I can't say, because I don't know, how many weeks this was prior to this proceeding in court."

His reference to fear of bodily harm was based upon an alleged occurrence before their separation when he said his wife threatened him with a pistol. Since that occasion he himself said that he had never actually seen her with a pistol in her possession, she denied that she had ever possessed or used one, no one other than the husband testified that she had ever been seen with a pistol in her possession, her mother testified that she had never known her daughter to use or possess a pistol. Dearholt in his complaint to the magistrate did not mention a pistol, and his own testimony as to the pistol is too contradictory and confused to be given credence or weight in a judicial proceeding. He testified: "If you want me to tell you the circumstances of it I will. It was her gun. It was a black Colt automatic. I can describe it as though it were lying on the desk because I showed her how to operate the safety catch on it. I said, 'What did you buy this gun for?' She wouldn't tell me. She didn't know how to operate it, but I showed her how to operate the safety catch of that gun. She said she needed it for protection. Now, that I remember, because we lived on a street that is in a secluded section there, and they don't have any foot patrolmen in that section, and they have had plenty of housebreaks in that section. You may ask her what happened to that gun, you can't ask me because I don't know. The last time I saw it was when we had a tussle on the front lawn of her home and she pulled it and threatened to shoot me. I last saw the black gun in 1930, just previous to when we got married. We got married in 1931, as I recall it, the first of the year, and that is when we had the tussle on the front lawn of her house. In fact we had been separated for two months prior to that and she intro-

duced me to her boy friend and said she was going with some one else. So when I started going with some one else she followed me and made a fool out of me in front of the girl I was taking home from moving pictures. She said 'I want to see you.' I just want to tell the court how things are. That is when I seen that automatic, when she pulled it on me and threatened to shoot me. Then she kicked a fit and tripped over on the lawn, and a man was passing. I hollered for him to come up there and help me and we took her into her mother's home, and put her on the couch and she made out she had fainted. But she whispered in my ear, 'Will you marry me?' I says, 'Yes—'. The last time I saw the gun was in 1930." Before that, when called by appellee, he had testified: "She chased me through the house with a gun just previous to when we separated and told me she was going to shoot me in the bathroom and she had the gun pointed at me ready to shoot me. I have been in constant fear ever since. That is the last time I seen that gun, but I know she was carrying one."

Upon the conclusion of the testimony, the chancellor announced that he would hold the cause to give the parties an opportunity to consider a reconciliation. Following that the wife went to the husband's home, and after waiting for an hour without seeing him she left. She returned, she said, on the following day at about 11 o'clock in the morning, and knocked for admission. Her husband, who was in bed, got up, let her in, and went back to bed. In reference to his attitude on that occasion she testified: "I did not know how to start the conversation. I said, 'Roy, I am glad you accepted me back,' and he said 'What do you mean accepted you back?' He said, 'I haven't accepted you back.' He said, 'I haven't written to you and I haven't come after you.' He said, 'You are coming over here willingly,' and he said, the court has forced us both into this situation,' and he said, 'I don't know how the arrangement is going to work out.' 'But,' he said, 'This is no fault of mine and the only thing I can do is to open the door and let you in.'" She

414

further testified that he told her that there was no gas range, no cooking facilities, that she would have to get her meals at her mother's home, or wait until he fixed "something up at supper time," that she had no luncheon or supper, but that at supper time he said he would go to his mother's home "and get his meal there," that when he returned he told her that "she had better watch her step around there," that he was having a man in the front room watch her, that he had a man "in there that grabbed a girl as she was coming through the hall" and that he had to get a policeman to "take care of the situation," that there was another man in there making loaded dice, the "man in the front room" told her that he had caught a colored man in the cellar and that he kept a dog there for protection, that when he returned from work her husband told her that he did not want her, that he wanted to know "where her pride was in staying there," but that if she did stay she could get his meals but, although there was only one sleeping room, when he went to bed he did not want her in the room, that he suggested that if she would commit adultery so as to give him a ground for divorce, he would make a "handsome settlement." She also said that the gas range was finally connected, but that after she had prepared a few meals he said that he wanted no more meals there, that they had no marital relations while she was there, and at the beginning he gave her to understand that they lived there "in name only," that while she was there she wrote at his direction a paper which they both signed under which he agreed to pay and she agreed to accept sixteen dollars semi-monthly, that the apartment and the surroundings were filthy, and so cluttered up that she had no place for such things as she needed for her personal use, that in short the place was no habitation for decent people. She further testified that, after she had endured his treatment and the conditions as long as she could, she said to him, " 'Roy, you have not treated me right, it does not look like you intend to.' I said, 'You have not treated me as a wife, you won't let me do any-

thing here or you won't tell me just what you want me to do for you, the way you like it done, and you want me to go to my mother's and you want to go to your mother's.'  I said, 'That is no way to live, you don't give me a kind word and I think I will leave'," and then she left.

Dearholt gave an entirely different account of the circumstances attending the attempted reconciliation.  In effect he said that he had tried to make the association pleasant, that he had treated his wife affectionately, and in the following testimony he described his attitude towards a reconciliation:  "As to why I was so anxious to take her back now rather than before, it was because I have been without her for a long time now and I really want her back.  When the court suggested that we should be reconciled, I thought so too, and I can't see any reason why, if she cares anything about me at all, she doesn't live with me, because I have been as lenient and I have given her every privilege possible.  I gave her anything she wanted within my power.  I do care for her, I have always cared about her.  As to what suggestion the court gave me about living together, the court said that I did not give my wife proper encouragement and I have always done it.  I have always kept an apartment for her to come there and she has repeatedly refused to come. What am I going to do, go to her home and carry her out bodily?  She knows I have an apartment and I have occupied that apartment on Ilchester Avenue, 409 Ilchester Avenue, for three long years.  That is the first floor of the entire house and this is a first class apartment. It has a club room in the cellar, oil burner for heat, a first class apartment and I kept that for three long years and she refused to come there as my wife.  As to why I am willing to accept her back now, it is because I am lonesome.  I have always been lonesome for her."  He said that while she was there they lived as man and wife, that the agreement was at her suggestion, that he had not suggested that she furnish ground for a divorce, that he wanted no divorce.

John Thomas Long, the "man in the front room," testifying on November 30th, 1939, said that on November 6th of the same year, between 10:30 and 11:00 o'clock in the evening, he heard Dearholt and his wife talking in loud tones in the hall near his apartment, and he then gave what purported to be a *verbatim* account of the dialogue which he overheard. The substance of his testimony was that Dearholt stood in the hall "persuading and coaxing" his wife, who stood with her suit case and umbrella on the steps, and "trying to get her in the house and she wouldn't."

Upon the failure of that experiment, the chancellor found from the evidence that the separation was due to the fault of the husband and decreed accordingly. In the opinion of this court no other rational conclusion was possible. It was suggested by his counsel that Dearholt was "mentally unsound," but there had been no adjudication of mental incompetence, he was holding a position of some responsibility, it must be assumed that the chancellor considered him competent, so, in the absence of anything more substantial than that suggestion, his competence is not open to question in this court. His statements when he testified as to his conduct and efforts at reconciliation while his wife was staying with him pending the suit were in such irreconcilable conflict with evidence which he gave before that experiment, as to justify doubt as to the value of any of his testimony. His statement, for instance, that he wanted her back, that he had always cared for her, that he was lonesome without her, and that he had "always been lonesome for her," cannot possibly be reconciled with his statements that he was "afraid of her," that he had been afraid of her before he married her, that he was married "practically at the point of a gun," that he did not talk to her because he was "afraid of her," that he was "in constant fear" of her, that even in court he did not "regard" himself "as safe." Nor does the testimony of Long add much to the weight of Dearholt's testimony. The ability to recall and repeat word for word a conversation of over

two hundred words, more than three weeks after it was heard, is so unusual as to justify some hesitation in accepting at its face value the testimony of a witness based upon such an extraordinary memory, and when the conversation which Long said he heard is so different both in form and substance from the testimony which the parties to it themselves gave on the witness stand, it can be given little weight.

It does appear without contradiction that the parties are living apart, it is also clear that the wife has made repeated efforts to end the separation and effect a reconciliation, that she went to her husband's home, that she requested a reconciliation, and that she wrote to him. When she went to his home, he had her arrested, when she wrote to him, he had his lawyer write her that she was "annoying him by letter and otherwise," and threatening her with "appropriate proceedings" unless she desisted. She did all she could reasonably be expected to do to effect a reconciliation; he did all that he could do to prevent it.

It follows that there was no error in the decree from which the appeal was taken and it will be affirmed.

*Decree affirmed, with costs.*