MARIANO MINICHELLO, petitioner-appellant,

*v.*

NINZIATA MINICHELLO, defendant-respondent.

[Submitted October term, 1946. Decided February 10th, 1947.]

*Mr. Meyer W. Stein (Mr. Peter Calcia,* of counsel), for the petitioner-appellant.

*Messrs. Feder & Rinzler,* for the defendant-respondent.

The opinion of the court was delivered by

WELLS, J.

This is an appeal by a husband from a decree dismissing a petition for divorce filed by him December 8th, 1944, against his wife on the grounds of her desertion on May 19th, 1939. The wife filed an answer wherein she denied deserting her husband and alleged that he had deliberately and willfully

deserted her in May, 1939, and had "thereafter made every effort to remain away from her" and had "at no time made any sincere offer for her return," and had instituted several suits thereafter against her "manifesting his strong desire to dissolve the bonds of matrimony existing between them."

The only prayer for relief by the wife is that the petition filed against her be dismissed with costs.

The case was tried by Advisory Master Campbell, to whom it had been referred, and he, at the conclusion of the husband's case, without hearing the wife's defense, orally expressed his views to the effect that the wife's refusal to accompany her husband to and reside with him in another home may have been willful and continuous, but it was not obstinate.

With this we are in accord.

The parties were married September 29th, 1936, and both have continuously lived in the State of New Jersey ever since. At the time of the marriage the husband had seven children by his first wife, three of whom were over 21, and the others were 19, 17, 15 and 8 years of age, respectively. The husband testified that he had known his wife only "a couple months" before the marriage, and during the time she had visited his and met his family at Emerson, New Jersey, where he lived with five of his children, and that during this visit he had a conversation with his intended wife to the effect that upon their marriage he and his children, presumably referring to the five, were to live with them in the wife's four-room apartment in Garfield, New Jersey. The wife did the cooking and household work, and, according to the husband, for one year and eight months they all got along well together until he discovered that the wife was buying food at his expense and giving some of it to her sister, who lived in the upstairs apartment. He said that in 1938, upon his wife's refusing to stop this practice, he and his children left the wife in the Garfield apartment and went to Passaic where they occupied rooms on Summer Street. Within two weeks, the wife, who had not heard from him since he left, sought him out and told him she wanted to live with him again, and she went to

Passaic and rejoined her husband and his family. They lived together there for some time when, at the tearful entreaties of the wife, he says he moved back to the wife's apartment in Garfield, taking his children with him; but he says that the wife resumed the practice of taking his food upstairs to her sister, and he told her that this time he was going to move and that he had rooms in an apartment at 187 Grove Street, Passaic. He said that he asked her to come over and look at them. She refused to do so, and on May 18th, 1939, he and his children moved back to Passaic and have lived there ever since. The husband says that, on the day of the moving, after he had loaded his furniture on the van he invited his wife in the presence of two witnesses, whom he had requested to be present, to "come along and live with us." The substance of the testimony of the two witnesses was that the husband did ask the wife to go with him and his family to Passaic and she declined, giving as a reason that she couldn't live with the older children, who were the cause of their trouble. Both witnesses said the husband showed no signs of affection for his wife. His invitation was manifestly perfunctory and for evidential purposes.

From this time the husband and wife lived separate and apart and have had no marital relations.

The husband at first denied that there was any friction between the wife and children, but on cross-examination he admitted he knew his wife and his daughter, Helen, who was about 16 at the time of the marriage, did not get along, that they had had a fight in which the wife threw a coffee pot at Helen and received a black eye, and that Helen had the wife arrested and brought before the police court.

Helen said that friction arose about three and a half to four months after the marriage; that there were quarrels, arguments and constant bickering on account of the children, who, the wife complained, made the conditions unlivable. The husband said that he always took the children's side.

On May 19th, 1939, the day following the moving to Passaic, Helen, at her father's dictation, sent a registered letter to the wife beginning: "Dear Mrs. Minichello." He and the

family had always called her "Nancy." The husband says he wrote her a nice letter, but it was returned unopened. He did not offer it in evidence.

However, assuming, but not deciding, that the conduct of the wife constituted desertion on her part, we are confronted with two questions. First, did he sincerely seek her return, and second, if not, were the facts and circumstances such as to justify him in failing to make an effort to bring about a reconciliation. In other words, was the desertion obstinate? Was it against the husband's wishes? We think not.

As was said by this court in *Baxter* v. *Baxter, 101 N. J. Eq. 236:*

"The rule in cases of this kind has been settled in a number of our decisions, a leading authority being *Hall* v. *Hall, 60 N. J. Eq. 469,* where it was said: 'That a desertion, in order to be obstinate, must be persisted in against the willingness of the injured party to have it concluded is declared by all our cases; and, ordinarily, when the husband, has, by his conduct toward his wife, contributed in any degree to her original desertion, the law requires that he should evidence that willingness by making such advances or concessions to his wife as might be reasonably expected to induce her to return to him. (Citing cases.)' "

Mr. Justice Gummere (later Chief-Justice) who delivered the opinion in the *Hall Case,* from which the above rule was quoted, stated the following exception to that rule:

"But the law does not impose this duty upon the husband in every case, arbitrarily, and without regard to the facts and circumstances by which it is surrounded. The husband is bound to make such advances and concessions only when there is reasonable ground to suppose that such action on his part will terminate the wife's desertion. Where it is manifest from the circumstances under which the desertion took place or from her temper and disposition, or from any other fact in the case that honest effort on the husband's part to terminate the separation would be unavailing, or, if successful in bringing the desertion to an end, would be so only temporarily, the duty of making it does not exist. (Citing cases.) The burden rests upon the husband of showing the futility of

making the effort which the law ordinarily requires of him, for it will not be presumed in the absence of proof, that the wife will persist in continuing her desertion against the honest attempt of the husband to bring it to a conclusion."

*Cf. Henderson* v. *Henderson, 134 N. J. Eq. 363; Laing* v. *Laing, 110 N. J. Eq. 410.* The present case is not within the above noted exception.

The husband admitted that with the exception of the time he saw his wife in the attorney's office in August, 1939, and twice in the Domestic Relations Court, in 1940, where an order of support was made against him, he never saw or talked to her after their separation in May, 1939, until a few weeks before Christmas, 1941, when, in response to a letter he wrote asking her to come see him, she went to his shop. Helen and another person were there, and she wouldn't go in. They talked outside, and he said he begged her to come back and live with him and the children. She said, "No."

The probation officer of Bergen County (to whom the judge had referred the case at the court proceedings brought by Mrs. Minichello for support) and also John F. Grossi, clerk of the Paterson, New Jersey, Police Court, another witness produced by the husband, testified that on separate occasions the wife in the presence of her husband had said she would gladly go back and live with him and "try it out with the family," excepting Helen, who hated her. The husband replied that if she didn't take Helen "it would be all off;" that he wouldn't give up his children for his wife or anybody. He accused his wife of causing all the trouble by giving her sister food. This Mrs. Minichello denied having done. The youngest child testified that she had never seen her step-mother take food upstairs. The husband on cross-examination admitted that he knew that Mr. Grossi had written a letter to Mrs. Minichello on April 10th, 1940, about their marital troubles, but denied that he had told Grossi to try and arrange with his wife for a divorce, but he admitted that he wanted a divorce. This was within two years after the separation, and at a time when he claims he was trying to persuade his wife to return to him.

There is complete absence of any testimony that the husband made any sincere effort to bring about his wife's return. Except as hereinbefore stated, he never wrote her a letter. He never called upon her, although he knew she was still living in the same apartment in which they started their married life. He sent her no messages, no presents, no money, except the sums he was required to pay her by order of the court. He asked no one to intercede with his wife to return to him. He knew of her unhappiness and the cause, and yet made no promises or efforts to remedy the condition; and after the separation gave her no assurance that her grounds of dissatisfaction would be removed.

Counsel for the husband cites *Buckner* v. *Buckner*, decided by the Court of Appeals of Maryland, *118 Md. 101; 84 Atl Rep. 156,* which counsel designates as the leading case in the United States on the question of the right of the children of a former marriage to remain in the home against the objection of the wife. The *Buckner Case* affords no support for Mr. Minichello's petition for divorce. It differs materially from the instant case. In the *Buckner Case* the husband by writing, pleading and personal calls begged his wife to return and assured her that the daughters, who were the cause of the trouble, had promised not to interfere. He sent his brother-in-law to see his wife with a view to an amicable adjustment, and even after the court had heard the case and expressed his views, but before the decree was entered, the husband made a final effort to bring about a reconciliation with his wife by offering to provide a home apart from his daughter. This overture was rejected. Counsel for the wife in the instant case cites the *Buckner Case* as authority for the rule that it is the duty of the husband to remove the cause of dissatisfaction.

There was no antenuptial agreement between the Minichellos that his children were to remain in the family indefinitely and notwithstanding their mistreatment of the wife. It would be unfair to hold here that a wife must occupy a position in her husband's household subservient to his children by a former wife, and under conditions where she is treated with great discourtesy by his children and where the husband,

knowing the conditions, makes no effort to control their conduct.

Our reading of the testimony satisfies us that the separation was not against the will of the husband but was due in large measure to his conduct; that he made no honest effort to effect a reconciliation; that there was nothing in the wife's conduct to justify the conclusion that it would be useless to ask her to come back. We find no testimony on behalf of the husband suggesting that it would be futile to attempt a reconciliation or that if the reconciliation were effected it would be merely temporary. The burden in this respect rested upon the husband. *Henderson* v. *Henderson, supra.* He failed to sustain it.

The testimony adduced by the husband fell far short of showing a course of conduct on his part that would naturally tend to induce his wife to return. The learned advisory master, therefore, properly held that her desertion, conceding it was a desertion, was not obstinate.

Counsel for the husband contends that the award of counsel fees of $250 to the wife is unwarranted, excessive and unreasonable. There are no proofs supporting this contention. Our examination of the record and briefs leads us to a contrary view. We think the advisory master was well within the exercise of a sound discretion in the allowance of the counsel fees.

The decree dismissing the petition and awarding counsel fees and costs below will, therefore, be affirmed, with costs here.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, COLIE, WACHENFELD, EASTWOOD, WELLS, RAFFERTY, DILL, FREUND, McLEAN, JJ. 14.

*For reversal*—None.